2021 IL App (2d) 190917-U
Nos. 2-19-0917 & 2-20-0066 cons.
Order filed August 3, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF MAURA J. O'MALLEY, | ) ) | Appeal from the Circuit Court of Kane County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| and | ) | No. 18-D-242 |
| | ) | |
| JOSEPH B. O'MALLEY, | ) | Honorable |
| | ) | Joseph M. Grady and William J. Parkhurst, |
| Respondent-Appellant. | ) | Judges, Presiding. |

JUSTICE HUDSON delivered the judgment of the court.
Justices Birkett and Brennan concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) Trial court did not err in using expatriate allowance and related tax-protection amounts to determine husband's available income for purposes of setting spousal support; (2) trial court erred in including value of restricted stock units awarded to wife as part of equitable distribution of marital assets to determine husband's available income for purposes of setting spousal support; (3) award of monthly maintenance to wife in the amount of $15,000 per month did not constitute an abuse of discretion; (4) trial court did not err in finding that husband failed to prove by clear and convincing evidence amount of gain attributable to husband's non-marital retirement assets; (5) trial court did not abuse its discretion in ordering husband to contribute to wife's attorney fees pursuant to section 503(j) of the Illinois Marriage and Dissolution of Marriage Act; but (6) trial court abused its discretion in ordering husband to contribute to wife's attorney fees pursuant to section 508(b) of the Illinois Marriage and Dissolution of Marriage Act.

¶ 2 Respondent, Joseph B. O'Malley, appeals from an order of the circuit court of Kane County dissolving his marriage to petitioner, Maura J. O'Malley. On appeal, respondent raises three principal contentions. First, he argues that the trial court erred in calculating his income for purposes of setting spousal support. Second, he argues that the trial court erred in failing to attribute gain to his non-marital retirement assets. Third, he argues that the trial court erred in ordering him to pay attorney fees incurred by petitioner. For the reasons set forth below, we affirm in part and reverse in part.

¶ 3                                 I.  BACKGROUND

¶ 4 The parties were married on September 2, 1988. Four children were born to the parties during the marriage. On February 26, 2018, petitioner filed a verified petition for dissolution of marriage. On August 29, 2018, respondent filed a counter-petition for dissolution of marriage. On March 20, 2019, the parties entered into an Agreed Allocation Judgment and Parenting Plan for D.O., the only child who was a minor at the time of the dissolution proceedings. The remaining issues were tried over several dates between March 19 and April 3, 2019, with the parties being the only witnesses to testify.

¶ 5 At the time of trial, petitioner resided in Kane County while respondent lived in Geneva, Switzerland. Petitioner was 55 years of age and respondent was 56 years of age. Both parties testified they were then in good health, although respondent had surgery in 2018 to remove a cancerous tumor from his thigh. Petitioner recounted that she had left high school early and worked full time in retail. Petitioner received a GED in 1985. Petitioner then worked as an office administrator for a national temporary health company, becoming branch manager before she left that employment in 1991. Thereafter, petitioner worked for two years at a local temporary health firm before the parties decided she would stay home to raise their children. The highest annual

income petitioner made at either workplace was about $30,000. Between 1993 and 1998, petitioner worked as a part-time salesperson at Gap Kids. Petitioner also took a certification class for Montessori teacher training, which led to a position as an assistant to the director at a Montessori school. At that time, two of the parties' children attended the school, and petitioner received compensation in the form of a tuition discount. After the parties' third child was born, they decided petitioner would discontinue her employment at Gap Kids, although she remained with the school to help with tuition. Petitioner continued to work at the school when the parties' youngest child, D.O., was born in December 2001. Thereafter, petitioner devoted her time to volunteering for different organizations, including the children's schools and an animal shelter, and caring for the children and the marital home.

¶ 6     Respondent started working at age 15, and, during high school, began working at Jewel Food Stores. Respondent remained employed at Jewel on a part-time basis from 1979 to 1991. During that employment, respondent contributed to the company's retirement plan every year. Early in 1984, respondent also took a part-time teller position at Dunham Bank while continuing to work part-time at Jewel. When respondent graduated from college in December 1984, he continued his employment at both Jewel and Dunham Bank. Thereafter, Dunham Bank was acquired by First Financial Services, which was thereafter acquired in succession by First Chicago, First Chicago NBD, Bank One, and, ultimately, JP Morgan Chase. Respondent continued to work at the bank during these transitions, and he contributed to his retirement plan every year he was there. By the time he left Bank One in 1999, he had risen to the position of first vice president. Respondent then worked a short stint at The Northern Trust, followed by a position with La Salle Bank, where he stayed from June 1999 to March 2008. In 2008, he moved to JP Morgan Chase, where he was employed at the time of trial.

¶ 7    In the summer of 2013, respondent talked about a possible position with JP Morgan Chase in Geneva, Switzerland, and, according to petitioner, "it sounded exciting to the family." Petitioner and the children "encourage[ed] [respondent] to look into it." Petitioner testified that she was "absolutely" in favor of the relocation as it presented an "exciting opportunity" for the children to be "exposed to different cultures and nationalities, [and] to travel." Although the offered position was "indefinite," the parties sold their house and made the international move in 2014.

¶ 8    Since then, respondent has been on foreign assignment. He works for JP Morgan Chase U.S. in Switzerland and is considered to be "on loan" from JP Morgan Chase U.S. to JP Morgan Switzerland, which is a separate legal entity. Respondent is paid by JP Morgan Chase U.S., which remains his "official employer." Respondent does not have a written employment agreement with either JP Morgan Chase U.S. or JP Morgan Switzerland. Respondent testified that the lack of a written employment agreement is not unusual. Upon his assignment in Switzerland, respondent assumed his current title of "managing director—senior credit officer." In this position, respondent is responsible for the credit and loan portfolio of JP Morgan Switzerland, which is valued at approximately $14 billion. This involves approving and declining requests of credit, monitoring that credit, and collecting on credit that has defaulted. He also reports directly to the audit committee and the board of directors, and he sits on the management committee.

¶ 9    Respondent testified that when he took the position in Switzerland, he was offered a "relocation package"—commonly known as an "expat allowance"—which included family relocation expenses, a housing allowance, an education allowance for the children, allowance for language courses, and family airfare to travel between the U.S. and Switzerland for holidays. Respondent testified that some of these line-item allowances were recurring, while others were incurred only once. Respondent received this package of benefits as part of his compensation and,

early in his foreign assignment, the expat allowance exceeded $200,000 annually, with respondent being taxed on these benefits as income. To ensure respondent was protected from a tax standpoint, his employer provided respondent additional compensation to cover the tax liability on these benefits, thereby effectively paying his annual taxes on the expat allowance.

¶ 10 Respondent testified regarding his 2018 annual compensation summary, which showed his earnings for 2018, the year-end that was closest to the trial. Respondent indicated that his "total compensation" for 2018, excluding the expat allowance, was $429,499, which was comprised of two components: (1) $302,999 in salary and (2) $126,500 in a discretionary "annual incentive award." Respondent elaborated that the salary component was the sum of respondent's "home base salary," *i.e.*, his gross annual base salary of 275,000 Swiss Francs, and a "FAP differential," *i.e.*, an additional 20,000 Swiss Francs he received due to his foreign assignment, totaling 295,000 Swiss Francs, or roughly $303,000. Respondent further explained that the "annual incentive award" was broken down into a cash portion ($82,225) and a restricted stock unit (RSU) portion ($44,275). Respondent testified that his expat allowance is not included in his "total compensation," but is accounted for separately, as reflected in a February 28, 2019, monthly "Expatriate Pay Detail Report." The "earning" section of the Expatriate Pay Detail Report includes three entries, with the first two entries—respondent's "home base salary" and "FAP differential"— equaling the roughly $303,000 in U.S. Dollars shown as his "salary" on the 2018 annual compensation summary. The third entry is respondent's expat allowance, which is listed as "Transition allow—Host based."

¶ 11 The February 28, 2019, Expatriate Pay Detail Report—the most current evidence of respondent's monthly compensation at the time of the trial—showed that respondent's monthly expat allowance was 6325.42 Swiss Francs, which equaled $6395.83. Respondent testified that his

monthly expat allowance decreases over time and that, over a course of five years abroad, the expat allowance will be phased-out and will fully terminate in February 2020. The "U.S. Year to Date" total for the expat allowance as of February 2019 was $19,589.48. Although this is more than what it should be for two months at $6395 per month, respondent explained the monthly amount had just decreased in February 2019, as was the standard for the prior three years. Each year between 2017 and 2019, the package was reduced by 33% effective with the February payroll. Thus, the February 2019 year-to-date sum included the January expat allowance in a higher amount plus the newly-reduced February amount. As noted, the expat allowance included a tax-protection amount to cover the income taxes due on that allowance, and all are reported as part of respondent's W-2 wages. Respondent testified that although the expat allowance and the related taxes are included as wages on his W-2 statement, he does not actually receive this money in-hand.

¶ 12    In addition to the monthly "earnings" listed in the February 2019 Expatriate Pay Detail Report, respondent also has the potential to be awarded an annual incentive award. As noted above, respondent's 2018 annual compensation summary showed that his 2018 award, which was paid in 2019, totaled $126,500, with 65% paid in cash ($82,225) and 35% comprised of a grant of RSUs ($44,275). Although respondent has received an incentive award every year he has been in Switzerland, the award is "completely discretionary" and in some prior years no incentive award was given.

¶ 13    Respondent explained that when he is granted an award of RSUs, he cannot immediately sell that stock for cash. Instead, the RSUs are earned out over three years in an established vesting cycle if respondent remains employed with the firm. This means that the first year after the grant, he receives nothing. After the second year, he receives 50% of the award upon its vesting. At the end of the third year, the remaining 50% of the award vests. The RSUs are taxable as ordinary

income at the time they are received, and the value at that time may be greater or less than the value at the time of the grant.

¶ 14    Respondent testified that the parties' 2015 U.S. income tax return showed total income of $677,493. The parties' U.S. tax for 2015 was $63,223. Respondent was also assessed $147,959 in Swiss taxes, which both he and JP Morgan U.S. pay. Respondent pays the Swiss taxes monthly on his base pay, cash bonus, and vested RSUs, and JP Morgan U.S. pays taxes on the expat allowance.

¶ 15    The "tax protection" respondent received from JP Morgan U.S. in 2015 in the form of a gross-up for the taxes incurred on his expat allowance was explained in a letter dated April 5, 2016, that he received from his accountants, KPMG, which prepares his annual tax filings for both the U.S. and Switzerland. The letter provides a detailed breakdown of the numerous line-item expenses that are covered by the expat allowance, and shows that respondent's total expat allowance for 2015 was $204,004. The letter also shows that respondent's 2015 wages—including the "tax protected items," *i.e.*, the expat allowance—totaled $659,483. Upon dividing respondent's 2015 wages of $659,483 into two categories of "taxpayer responsibility" and "JP Morgan Chase responsibility" (the latter being the expat allowance), the letter reflects that JP Morgan U.S. owed respondent $46,832 for taxes attributable to the $204,004 of his expat allowance. The letter further explains this "tax reimbursement amount" represents "additional taxable income [to respondent] which is reportable in 2016."

¶ 16    Respondent testified that the parties' 2016 U.S. tax return largely tracked that of 2015, except it showed increased compensation because the value of the RSUs that vested in 2016 had significantly increased due to a market upturn between the time they were awarded in 2013 and thereafter vested in 2016.

¶ 17    In 2017, the parties U.S. tax return included a foreign tax credit statement showing

$218,081 paid in Swiss taxes and provided an overview of all foreign taxes paid from 2014 through 2017. The 2017 "tax protection" letter issued by KPMG dated April 6, 2018, showed that for 2017, respondent's expat allowance was $229,658 and that of his total $745,537 in W-2 wages, JP Morgan U.S. owed respondent $60,250 that was attributable to taxes due on the expat allowance and would appear as taxable income in 2018. Respondent testified that by the time of trial, many of the listed categories that made up the 2017 expat allowance of $229,658 had been phased out and reduced into a monthly payment of approximately $6395, or $76,740 annually.

¶ 18    Respondent acknowledged that his W-2 statements from 2015 to 2018 reflected that his income had been consistently rising during the period he worked in Switzerland, with his Medicare wages increasing from $683,482 in 2015 to $791,808 in 2018. Respondent testified, however, that although his reported income increased, his guaranteed salary did not. Moreover, he testified that he did not receive all the money that was reported because of deductions for income tax, Medicare, Social Security, insurance, and other items.

¶ 19    Respondent prepared a balance sheet dated March 18, 2019, reflecting the parties' assets and liabilities. Respondent testified that he has no pension benefits from JP Morgan Switzerland because he is not employed by that entity. However, as reflected on the balance sheet, the parties have several retirement accounts, two of which respondent claimed were partly non-marital because he had been contributing funds to them prior to the parties' 1988 marriage: (1) a JP Morgan Chase 401(k) with a balance of approximately $1.4 million and (2) a JP Morgan Chase individual retirement account (IRA) with a balance of approximately $636,000.

¶ 20    In support of his non-marital claim, respondent introduced his individual tax returns from 1985 through 1988 to illustrate his pattern of pre-marital retirement contributions. The 1985, 1986, and 1987 returns showed contributions of $1000, $2000, and $300, respectively, that were never

withdrawn and which respondent stated were part of the JP Morgan Chase IRA. Respondent's W-2 statements from Jewel accompanied his 1987 return and showed his participation in Jewel's pension and deferred compensation plans. Respondent never took any distributions from the Jewel accounts, and he stated they rolled over into the JP Morgan Chase IRA. Respondent's 1987 tax return also included W-2 statements from First Chicago, confirming he participated in its pension and deferred compensation plans as well. Respondent never received distributions from the First Chicago plans. The First Chicago deferred compensation plan was the predecessor to the current JP Morgan Chase 401(k) plan, and the First Chicago pension plan is now part of the JP Morgan Chase pension plan. In 1988, respondent continued to work for Jewel and First Chicago, making these same types of contributions and not withdrawing anything from the plans. Respondent never withdrew any money from his retirement accounts and reinvested earnings. Respondent always contributed to retirement plans when they were available, and he oversaw the management of his retirement assets both before and during the marriage.

¶ 21    Respondent testified that when a retirement account earns dividends and interest, the account "increases in value using the time value of money theory." Over petitioner's objection, respondent performed a calculation to determine the current value of his pre-marital contributions to the JP Morgan Chase 401(k) and IRA accounts by analyzing the rate of return for the S&P 500 over the 30-year term of the parties' marriage. Considering reinvested dividends, the return rate was 10.295%. Respondent then applied this 10.295% rate of return to his estimated $20,000 of pre-marital contributions and the reinvestment of the dividends over the course of the 30-year marriage to conclude his pre-marital contribution was now worth $389,000, and that this was the amount of non-marital funds contained in the JP Morgan Chase 401(k) and IRA accounts. Petitioner confirmed that when she met respondent she knew he was a "saver" and that respondent

continued to be a "saver" during the marriage.

¶ 22    As to the marital standard of living, respondent testified that during the marriage, the parties purchased luxury vehicles, but most were used and several years old when acquired. He also testified that the standard and cost of living was significantly higher in Switzerland, including for housing, food, and insurance. For instance, he paid $7400 per month in rent in Switzerland. Petitioner testified that when the parties lived in West Chicago prior to moving to Switzerland, they had a "high" standard of living. Petitioner testified that respondent frequently bought her jewelry during the marriage, including sapphire earrings, diamond earrings, and an Omega watch. Petitioner also stated the parties "lived well but frugally" during their marriage and that she and respondent lived the lifestyle of "savers." Moreover, the family traveled extensively both before and after moving to Switzerland, including trips to Colorado, Florida, California, Aruba, Puerto Rico, Costa Rica, Mexico, England, France, Greece, Italy, Ireland, Spain, and Thailand.

¶ 23    In October 2017, respondent told petitioner he was having an affair. Respondent admitted at trial that in 2016, he became romantically involved with another woman, Noema Morales. In March 2017, respondent loaned Morales $170,000, without petitioner's knowledge or prior consent. After respondent's relationship with Morales ended, he met a second woman, Katazryna Podogorna, in March 2017. Respondent subsequently hired an attorney to sue Morales for repayment of the loan. Respondent has incurred more than $15,000 in legal fees associated with the lawsuit against Morales. As of the date of trial, Morales had paid back roughly $18,000 of the loan. Respondent remained romantically involved with Podogorna at the time of trial. In December 2017, respondent gave Podogorna charge privileges on one of his credit cards.

¶ 24    After petitioner learned of respondent's affairs, she flew back to Illinois in February 2018 and filed for divorce. Although petitioner returned to Switzerland so D.O. could finish her school

year there, she ultimately moved back to Illinois on July 17, 2018. Petitioner started to look for work in January 2019. At the time of her deposition in February 2019, she had completed job applications at Costco and Delnor Hospital. After her deposition, she applied to a few more places, including grocery stores and an animal shelter. She had no interviews and did not utilize any counseling service to search for jobs.

¶ 25    Petitioner submitted two financial affidavits. The first was dated June 11, 2018. It estimated petitioner's monthly expenditures at nearly $18,000 based on expenses incurred in Switzerland, where she was living at the time. Petitioner acknowledged that the cost of living in Switzerland is higher and that the listed expenditures included an entry of $7500 for rent in Switzerland, as well as higher expenses for utilities such as gas, electric, and water. Petitioner stated that the first affidavit contained several "errors," including: (1) listing all four children as living with her when only the two youngest did; (2) listing expenses for maid service in Switzerland which she did not have in Illinois; (3) claiming $2758 in tuition for D.O.'s private school in Switzerland when D.O. attended public school in Illinois; and (4) listing a $533 monthly combined expense for school trips, tutoring, and extracurricular costs in Switzerland that D.O. did not incur in Illinois.

¶ 26    By the time petitioner completed her second affidavit dated February 18, 2019, she had lived in Illinois for more than six months, and was paying $2800 per month in rent. However, she stated that the second affidavit included many of the same figures reflecting Switzerland expenses used in her prior affidavit because she "was saving time." In addition to showing an incorrect address, the second affidavit, which listed $14,378 in monthly expenses, repeated several "mistakes" petitioner had acknowledged in her first affidavit, including that all four children lived with her and listing Switzerland tuition and other school-related expenses totaling more than $3200 per month that were not incurred on behalf of D.O. in Illinois.

¶ 27    During trial, petitioner submitted, over respondent's objection, an undated document titled "Maura's Living Expenses" that claimed $13,400 in monthly expenses. Petitioner testified the document was "probably" prepared within four weeks prior to trial. Petitioner testified she regularly paid expenses for her three adult children and she had used receipts and bills from July 2018 onward to prepare this exhibit, although those underlying documents were not produced.

¶ 28    The parties also filed dissipation claims against each other. Respondent alleged petitioner dissipated $148,035 based upon her use of credit cards and "excessive spending" that was "outside the norm of [the marital] standard of living." With respect to the $648,633 dissipation claim petitioner alleged against him, respondent admitted he had dissipated $163,372 related to payments made to his current girlfriend. Respondent denied the remainder of petitioner's allegations, asserting she had incorrectly included many non-dissipation items. In turn, petitioner acknowledged that her $648,633 dissipation claim against respondent was not signed by her. She also testified to numerous "mistakes" in claiming items as dissipation, including family vacations, balance transfers between marital accounts, physician charges she incurred for surgery, and cash withdrawals made by respondent. Petitioner confirmed she could have been "more vigilant" in preparing her claim, and it would have been less without the "mistakes," although she did not know by how much.

¶ 29    After the trial concluded, but before closing arguments, respondent filed on April 17, 2019, a petition for contribution to attorney fees and costs and for sanctions pursuant to sections 501, 503, and 508 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/501, 503, 508 (West 2018)) and Illinois Supreme Court Rule 137 (eff. Jan. 1, 2018). Respondent alleged petitioner had engaged in "unreasonable litigiousness" and "a pattern of conduct that unnecessarily increased the cost of litigation" including: (1) petitioner's confirmation at trial that her dissipation

claim was "inflated," prepared with "limited to no investigation" and that she could have been " 'more vigilant' in reviewing the transactions," many of which were her personal expenses and those of the family; (2) her "recklessly prepared financial affidavits" that included "grossly inflated expenses that were no longer being incurred or were over estimated [*sic*]," resulting in her being "impeached several times while on the stand with her deposition testimony" due to "a number of mistakes and errors"; and (3) petitioner's "repeated failures to abide by Illinois Supreme Court discovery rules as evidenced by her trial testimony."

¶ 30    On April 18, 2019, petitioner filed a motion for leave to file her own petition for fees and costs pursuant to section 503(j) of the Act (750 ILCS 5/503(j) (West 2018)). Petitioner asserted that she had incurred attorney fees and costs in excess of $120,000, of which $53,648 remained unpaid. Petitioner requested that respondent contribute $53,648 to her unpaid attorney fees and costs, "plus an additional sum of at least $15,000" to "prepare the proposed Judgment for Dissolution of Marriage with findings, respond and defend against [respondent's] Petition for Contribution to Attorney's Fees and Costs and for Sanctions, and prepare and conduct the closing argument." Over respondent's objection, the court granted petitioner leave to file her motion. In his May 1, 2019, response, respondent argued that petitioner's fee request should be denied because any increased fees were in large part due to her own "unreasonable litigiousness, improper dissipation claim and grossly inflated financial affidavits."

¶ 31    On May 3, 2019, the parties' attorneys presented closing arguments in open court. Relevant here, petitioner asked that she be awarded 50% of the net marital estate and $15,000 per month in maintenance based upon respondent's W-2 wages of "$800,000 per year." Petitioner also requested that the marital estate be reimbursed in the amount of $384,000 for funds respondent "admittedly spent on his mistresses" and that respondent's dissipation claim against her be denied

in its entirety. Respondent countered that his "true income" was not reflected by the wages listed on his W-2 statement, but instead consisted of his base pay, cash bonus, and the "potential" RSUs, which in 2018 totaled $424,499 before taxes. Upon applying a 35% tax rate, the $15,000 monthly maintenance requested by petitioner was 64% of respondent's net income. Based upon respondent's base income and imputing $35,000 to petitioner as her annual income, respondent proposed a guidelines calculation of tax-free support of $4850 per month plus 25% of his bonus, if and when received. Respondent also proposed, *inter alia*: (1) a 50-50 allocation of a net marital estate he valued at about $2.9 million; (2) the court find that his $20,000 pre-marital retirement account contributions grew to more than $389,000 over the 30-year course of the marriage; (3) petitioner be denied contribution to her attorney fees in light of the 50-50 division of the marital estate and because she caused an escalation of all fees due to her "litigious actions;" and (4) based upon petitioner's litigiousness, an award of attorney fees to him pursuant to section 508(b) of the Act.

¶ 32    The trial court entered a handwritten judgment of dissolution on June 10, 2019. Relevant to the instant appeal, the court determined that petitioner will be unable to support herself without assistance from respondent. After considering the statutory factors, the court found that maintenance was appropriate. The court then determined that respondent's gross income for 2018 was $791,808, based upon the income reported on his W-2 statement, and that there was "no reason to expect that the Respondent's annual gross income will be substantially reduced in the future." Noting that the maintenance amount guidelines set forth in section 504 of the Act (750 ILCS 5/504 (West 2018)) did not apply because respondent's gross income for 2018 exceeded $500,000 and after imputing an annual income of $15,000 to petitioner, the court ordered respondent to pay petitioner $15,000 per month in "indefinite" maintenance.

¶ 33    As to respondent's $20,000 contribution of pre-marital retirement funds to the JP Morgan Chase 401(k) and IRA accounts and the growth of these funds over the 30-year marriage, the court found that "[n]o evidence was presented of how the $20,000 was invested or how much it grew from year to year" and opined that "[i]t may have been completely lost during the recession of approximately 2007 to 2012." The court further observed that during the marriage, marital funds were continually contributed to the retirement accounts, "thereby arguably transmuting the $20,000 to marital funds." Moreover, the court reasoned that respondent's "estimate of the current value of his non-marital contribution is, as an estimate with no other clear and convincing evidence, speculative." Accordingly, the court awarded respondent $20,000 from the retirement accounts as his "sole and exclusive property."

¶ 34    Next, the court noted petitioner's contention that respondent had "earned or been granted 1174 RSU shares as of March 7, 2019," and that the parties "appear to agree" that these shares had a value of $121,767.28 as of that date. The court awarded petitioner "one half the value of any shares (RSUs) granted as of the date of the divorce if and when they vest." The court denied respondent's claim of dissipation by petitioner. However, it found that respondent dissipated marital assets totaling $384,208.76, including the $163,372.76 admitted in respondent's response to petitioner's dissipation claim and the loan of $170,000 to Morales. The court awarded petitioner $192,104.38, half of the amount dissipated. The court divided the principal financial assets equally between the parties. Finally, the court held that "[a]ny outstanding attorney fees shall be paid by each party to their respective attorneys," but ordered respondent to "contribute an additional $12,500 toward [petitioner's] attorney's fees."

¶ 35    On July 10, 2019, respondent filed a motion to reconsider the dissolution judgment, alleging several errors. Among other things, respondent asserted that the court overstated the

amount he had available for spousal support by erroneously finding his income was $791,808 based on his 2018 W-2 statement and failing to "take into account the unrebutted testimony and evidence regarding [respondent's] actual cash flow and income at present and going forward." Respondent contended that his income falls into four "buckets": (1) salary; (2) cash bonus; (3) RSUs that vest in a given year; and (4) the expat allowance and related benefits. Respondent argued that the evidence showed: (1) his only guaranteed compensation was his annual salary of $302,999; (2) although his expat allowance and its related tax-payment true-up was reflected in his reported W-2 wages, it did not translate into cash flow to fund support payments, and, in any event, the expat allowance had sharply declined from past amounts and would fully terminate in February 2020; and (3) his annual incentive award—consisting of the cash and RSU components—was discretionary, the value of the RSU component is undetermined until the time of vesting years later, and the Court had erroneously double counted the unvested RSUs by equally allocating them between the parties as property and then also including them as income by considering respondent's full W-2 wages (which included the value of the vested RSUs) for support. Therefore, respondent requested the court reconsider its income ruling and find his income for purposes of spousal support consisted only of his base pay of $302,999 plus one-third of his variable cash incentive award if, as, and when received (as 50% of the RSUs had already been awarded to petitioner as property in the judgment). This would result in respondent paying petitioner $5133 per month in maintenance, plus 1/3 of the net of any cash award he received at the time of receipt. With respect to respondent's pre-marital retirement funds, although he was awarded $20,00 of the approximately $2 million in retirement assets as his non-marital property, respondent asserted the court erred by attributing no gain or appreciation to those funds. As the parties were married for more than 30 years, respondent argued that "it defies logic and the stock market that no

appreciation or gain would have occurred to those pre-marital retirement assets." Therefore, based on the "unrebutted" evidence submitted at trial, respondent requested that the court reconsider its ruling and value his non-marital retirement funds at $389,000.

¶ 36     On July 19, 2019, respondent filed a motion to supplement his motion to reconsider the dissolution judgment, requesting that he be granted leave to supplement his motion to reconsider with information regarding his income that was not available at the time of trial. Respondent recounted that as of June 30, 2018, his year-to-date gross income from all employment sources, *i.e.*, the four "buckets" discussed in his reconsideration motion, was $575,623, as reflected on his June 30, 2018, paystub that was attached to the motion to supplement. One year later, respondent's year-to-date gross income from these same sources was $429,643, a decline of more than $145,000, as shown in the June 30, 2019, paystub attached to the motion to supplement. Respondent argued that comparing these two exhibits confirmed that a substantial portion of this decline was caused by a $63,236 reduction in his RSU payments and a $75,087 reduction in his expat allowance.

¶ 37     On July 23, 2019, the parties returned to court and respondent's motion to supplement his motion to reconsider was granted. Over respondent's objection, the court that day also granted in part an emergency request for injunctive relief filed by petitioner and enjoined both parties from making withdrawals from a joint JP Morgan account, except for required payments per the dissolution judgment, until the court resolved the motion to reconsider.

¶ 38     On July 31, 2019, petitioner filed a second emergency request for injunctive relief, claiming that respondent unilaterally depleted the marital estate without notifying her or obtaining leave of the court. Among other things, petitioner alleged that respondent: (1) transferred $61,000 to his individual account in violation of the July 23, 2019, order; (2) sold 1500 shares of stock

netting more than $174,000, which he used to pay down an equity line; and (3) surrendered three life insurance policies with a cash value of $91,000, which the judgment of dissolution had allocated equally to the parties to pay attorney fees and costs. That same day, the trial court granted petitioner's second emergency request for injunctive relief and enjoined respondent from withdrawing or otherwise disposing of "any and all financial accounts of any nature" and directed JP Morgan Chase to remove respondent's access to certain accounts.

¶ 39     On August 7, 2019, petitioner filed a petition for attorney fees and costs pursuant to section 508(b) of the Act (750 ILCS 5/508(b) (West 2018)). The bases for petitioner's request were twofold. First, petitioner alleged that respondent had "fail[ed] to comply with a court order without compelling cause or justification" by unilaterally surrendering the three life insurance policies that had been earmarked by the court in the dissolution judgment to pay attorney fees. Second, petitioner alleged that respondent "needlessly, and intentionally, increase[d] [her] litigation costs" where (1) he filed a motion for reconsideration of the dissolution judgment and (2) the trial court granted two post-judgment emergency restraining orders against respondent. Petitioner further alleged that after respondent received notice of the second emergency order, he harassed her over the telephone, calling her and her attorneys "stupid," telling her that she was "wasting money" and "extend[ing] the case," and threatening to "continue to appeal until there was no money left." Petitioner asserted that since entry of the dissolution judgment, she had incurred $12,426 in attorney fees. She requested that respondent pay that amount plus an additional $12,500 "to defend against [respondent's] Motion for Reconsideration and further protect her interests against [respondent's] calculated actions."

¶ 40     In his response to petitioner's petition for attorney fees and costs, respondent admitted he surrendered the three insurance policies, but stated that he did so in May 2019, prior to the entry

of the dissolution judgment on June 10, 2019. Respondent also admitted that he filed a motion to reconsider the dissolution judgment and that the court had granted two post-judgment emergency restraining orders against him. Further, respondent alleged that on or about July 19, 2019, his attorneys reached out to petitioner's counsel to explore settlement in an expedited mediation. Respondent alleged that instead of responding, petitioner filed her first request for injunctive relief the following day. Respondent therefore concluded that it was petitioner who caused the fees to unnecessarily increase.

¶ 41    The trial court heard oral arguments on respondent's reconsideration motion on August 23, 2019. On September 23, 2019, the court entered a handwritten order that granted in part and denied in part respondent's motion to reconsider. The court granted respondent relief on several claims not at issue in this appeal, but rejected respondent's arguments as to the claims that are at issue here. In denying respondent's request to reconsider its income finding, the court held: (1) calculating maintenance only on respondent's base salary "would require the parties to at least annually determine how much of the Respondent's bonuses and [RSUs] should be paid to the Petitioner * * * and would almost certainly set the parties up for protracted and frequent post-decree litigation"; (2) although respondent's expat allowance has been decreasing for several years, he earns more income and therefore the expiration of the expat allowance was "not certain to negatively affect" respondent's income based on his past income history; (3) because respondent has historically received cash bonuses and RSUs, there is no reason why he would not receive them in the future; and (4) because respondent had a history of "saving," he could budget for his monthly maintenance payments despite receiving his bonuses and RSUs only once per year. Accordingly, the court concluded that the maintenance award to petitioner of $15,000 per month "appears to be reasonable for the Respondent's income and will be significantly less than one-half

of the Respondent's income." Next, the court held that if the award of 50% of the RSUs as property to petitioner while also using their value to determine respondent's available income for support was "a double hit" to him, "it appears to be similar to a disproportionate division of the marital estate and will only be a double hit for the first three years of the Respondent's maintenance obligation." Finally, in rejecting respondent's claim as to the non-marital retirement accounts, the court acknowledged that respondent had $20,000 of non-marital retirement funds which he "co-mingled with marital funds in the parties' retirement accounts." The court therefore held that the increase attributable to respondent's $20,000 of non-marital funds over the course of the marriage as calculated by respondent was "at best speculative and has not been shown by clear and convincing evidence." As such, the court affirmed its award of $20,000 to respondent.

¶ 42    Also on September 23, 2019, the trial court conducted a hearing on petitioner's section 508(b) petition. During the hearing, petitioner stated that she was seeking a fee award "for what we would generically describe as bad conduct," in that, while the case was under advisement, respondent had surrendered the life insurance policies. Petitioner further stated that because of respondent's conduct, she was "required * * * to file a petition for a temporary restraining order" that she later "needed to supplement" because respondent "was actively removing funds from the parties' trust account." Petitioner also alleged that it had been 60 days since she has received any maintenance from respondent. As a result, petitioner requested nearly $25,000 in attorney fees.

¶ 43    Respondent countered that an award of attorney fees is appropriate under section 508(b) only if a party fails to comply with an order of the court without compelling cause or justification or if a party "needlessly intentionally increased the cost of litigation." Respondent argued that neither prong applied here. In support, he noted that he surrendered the life insurance policies a month before the entry of the dissolution judgment. Therefore, there was no court order prohibiting

him from doing anything with the policies at the time they were surrendered. With respect to the injunctions, respondent stated that the first injunction stemmed from a misreading of a bank statement where petitioner mistakenly thought funds were removed from an account but, instead, it was simply changed to a money market account rather than being held in stock. The second injunction was obtained on an *ex parte* basis without hearing. Respondent therefore posited that the amount of fees requested was "extraordinarily high" for a "limited amount of work." Finally, respondent argued that petitioner had "built into" her fee request a "component" that was related to work performed in answering respondent's motion to reconsider. Respondent argued that because the court granted several items of the relief requested in the motion to reconsider, that relief in itself "substantiate[d] a form of merit for that underlying petition" and would not support the imposition of attorney fees under section 508(b). In reply, petitioner admitted that respondent "was not under an order of court after the trial not to cash in life insurance." She argued, however, that it was "just commonsense" and the prudent thing to do if respondent needed money would have been to file a motion with the court. As to the motion to reconsider, petitioner asserted that the filing was "essentially baseless," but she needed time to prepare a response.

¶ 44    In ruling on the section 508(b) petition, the trial court did not believe the motion to reconsider was a basis for petitioner's fee request. Further, the court agreed with respondent's attorney that the motion to reconsider was "not improper," adding that "by the very nature of the circumstances of this case probably it was necessary." The court then stated, "I think at this point from everything I heard is a basis for a request for fees [*sic*]." The court also discussed the proceeds from the life insurance policies, stating that it did not know if the insurance money was still available, but had it been available it "would have * * * taken care of" the fees assessed by petitioner's attorney. Ultimately, the court ordered respondent to pay petitioner's counsel $24,746

in attorney fees pursuant to section 508(b) of the Act. Regarding respondent's argument that the fees requested was "extraordinarily high" for a "limited amount of work," the court stated that "every court appearance requires at least several hours of work" and this case involved "responding to a lot of financial aspects * * * on a continuing basis." Thereafter, respondent asked the court to order petitioner's counsel to identify the time spent "related to [the] injunctive motions if that's what the award of fees is based on." The trial court denied respondent's request. The court subsequently entered a written order requiring respondent to pay petitioner's counsel $24,746 in attorney fees "[f]or the reasons set forth on the record."

¶ 45 On September 30, 2019, petitioner filed a motion to adjust the judgment for dissolution of marriage and for other relief. Specifically, petitioner requested an order (1) releasing the assets awarded to her *instanter* while also continuing to restrict respondent's use of the remaining assets until a full accounting to determine any monies he had improperly taken and (2) requiring respondent to turn over detailed statements from 2019 to date regarding all accounts in his name, individually or jointly, and all accounts referenced in the judgment of dissolution. On October 11, 2019, respondent filed a motion to terminate or release injunction.

¶ 46 On October 23, 2019, respondent filed his notice of appeal in docket No. 2-19-0917, appealing the June 10, 2019, final judgment of dissolution of marriage, the September 23, 2019, partial grant and partial denial of respondent's motion to reconsider, and the ruling granting petitioner's petition for attorney fees and costs, also entered on September 23, 2019. On December 23, 2019, the trial court entered an order terminating the injunction and ruling on the motion to adjust dissolution judgment. On January 22, 2020, respondent filed his notice of appeal in docket No. 2-20-0066, appealing the rulings on petitioner's motion to adjust dissolution judgment and respondent's motion to terminate/release injunction entered on December 23, 2019, as well as

again appealing the three orders specified in his appeal in docket No. 2-19-0917. This court consolidated respondent's two pending appeals by order entered February 6, 2020.

¶ 47                                    II. ANALYSIS

¶ 48    On appeal, respondent raises three principal contentions. First, he argues that the trial court erred in calculating his income for purposes of setting spousal support. Second, he argues that the trial court erred in failing to attribute gain to his non-marital retirement assets. Third, he argues that the trial court erred in ordering him to pay attorney fees incurred by petitioner. We address each contention in turn.

¶ 49                                   A. Maintenance

¶ 50    Respondent first argues that the trial court erred in determining his available income for purposes of setting spousal support. Respondent advances two subarguments in support of his assignment of error. First, respondent asserts that the trial court erred in finding that his entire 2018 W-2 earnings of $791,808 were available for the payment of maintenance and that there was "no reason to expect that [his] annual gross income will be substantially reduced in the future" despite "uncontradicted evidence" that his expat allowance was a limited benefit that would terminate in February 2020. Second, respondent argues that the trial court erroneously double counted the RSUs both as property that was equally divided between the parties and as part of respondent's income stream for payment of maintenance. Respondent further contends that, based on this overstated income, the trial court abused its discretion in awarding petitioner indefinite maintenance in the amount of $15,000 per month. Finally, respondent contends that the trial court refused to revisit its findings and remedy these errors in response to his motion to reconsider despite his submission of additional new evidence to support his claims.

¶ 51    Petitioner counters that the trial court correctly determined respondent's income for the

purpose of calculating maintenance. According to petitioner, the Act broadly defines income for the purpose of calculating maintenance to include "[a]ll income from all sources," and this includes non-guaranteed income such as bonuses, incentive compensation, and respondent's expat allowance. Petitioner further maintains that the trial court did not err by including the value of the RSUs that were allocated as property to the parties as income for purposes of support because there is authority to support the trial court's decision. Petitioner also responds that the trial court acted within its discretion when it set respondent's monthly maintenance obligation at $15,000 because the evidence and the relevant statutory factors support such a finding. Finally, petitioner argues that the trial court's order denying respondent's motion to reconsider was not improper because the motion simply reiterated the same arguments respondent made at trial.

¶ 52                              1. Respondent's Income: Expat Allowance

¶ 53    Respondent initially argues that the trial court overstated the amount of his income available for spousal support by including his entire W-2 wage amount. According to respondent, the income reflected on his W-2 statement does not reflect "the actual cash flow" available to him to pay support. Specifically, respondent asserts that the expat allowance and related tax-protection amounts were not received by him "in-hand," were being phased out, and were to terminate entirely in February 2020. Thus, respondent reasons, it was against the manifest weight of the evidence for the trial court to include these sources when calculating his income for purposes of setting spousal support and also to find that there was "no reason to expect that Respondent's annual gross income will be substantially reduced in the future." Petitioner disagrees, arguing that there is ample evidence to support the trial court's inclusion of "non-guaranteed income" for purposes of calculating the obligor's available income for support.

¶ 54    Whether an item constitutes income for purposes of calculating maintenance is a question

- 24 -

of law subject to *de novo* review. *In re Marriage of Ruvola*, 2017 IL App (2d) 160737, ¶ 18. We are unpersuaded by respondent's claim that the trial court erred in including the expat allowance and related tax-protection amounts when calculating his income for purposes of setting spousal support. First, respondent's claim that it was improper for the trial court to consider the expat allowance and related tax-protected amounts in setting spousal support because the funds were not received by him "in-hand" ignores the legislature's broad and expansive definition of income for purposes of the Act. *In re Marriage of Rogers*, 213 Ill. 2d 129, 136 (2004). "Net income," as referred to in the maintenance statute, is defined in the child support section of the Act. 750 ILCS 5/504(b-3.5) (West 2018) (referring to section 505 of the Act (750 ILCS 5/505 (West 2018))). "Net income" is calculated by taking a party's "gross income" and subtracting certain deductions. 750 ILCS 5/505(a)(3)(B) (West 2018). In turn, "gross income" is defined broadly as "the total of all income from all sources." 750 ILCS 5/505(a)(3)(A) (West 2018); see also 750 ILCS 5/504(b-3) (West 2018). The Act does not define "income," but in *Rogers,* the supreme court stated that income is " 'something that comes in as an increment or addition * * *: a gain or recurrent benefit that is usu[ally] measured in money * * *: the value of goods and services received by an individual in a given period of time.' " *Rogers*, 213 Ill. 2d at 136-37 (quoting Webster's Third New International Dictionary 1143 (1986)). Additionally, income has been defined as " '[t]he money or other form of payment that one receives, usu[ally] periodically, from employment, business, investments, royalties, gifts and the like.' " *Rogers*, 213 Ill. 2d at 137 (quoting Black's Law Dictionary 778 (8th ed. 2004)). As such, income has been found to include a one-time, lump-sum workers' compensation settlement (*In re Marriage of Mayfield*, 2013 IL 114655, ¶ 25), a one-time conversion of funds from a traditional IRA to a Roth IRA (*In re Marriage of Pratt*, 2014 IL App (1st) 130465, ¶ 25), contributions to a party's "*pro forma*" capital account based on the annual

performance of the employer (*In re Marriage of Winne*, 239 Ill. App. 3d 273, 285 (1992)), funds from the payment of personal expenses by the obligor's employer (*In re Marriage of Olson*, 223 Ill. App. 3d 636, 652 (1992)), and gifts from the obligor's parents (*Rogers*, 213 Ill. 2d at 137; *Ruvola*, 2017 IL App (2d) 160737, ¶ 19).

¶ 55 In this case, the expat allowance and related tax-protection items constituted periodic benefits respondent received from his employer. In this regard, respondent testified that the expat allowance consisted of recurring and one-time line-item allowances for expenses such as relocation, housing, education, language courses, and travel. As such, they constituted income for the purposes of setting spousal support.

¶ 56 Despite the expansive definition of income, respondent asserts that the expat allowance and related tax-protection amounts do not constitute income, explaining that "[a]s a practical matter, it stands to reason that where funds are not actually available to spend as income, they should not be included as a basis upon which to calculate support." Contrary to respondent's claim, however, the expat allowance and tax-protection amounts *were* available to spend. As noted above, the record establishes that the expat allowance was spent on family relocation expenses, housing, education, language courses, and travel expenses. Indeed, respondent concedes in his brief that the funds were spent, noting that his employer used the funds to pay tuition amounts directly to his children's schools and the taxes to cover the expat allowance. Respondent cites no authority that the expat allowance and related tax-protection amounts should not be considered income for the purpose of setting spousal support because they were earmarked for a particular purpose and paid directly by his employer.

¶ 57 Respondent points out that prior decisions have determined that reinvested proceeds from a reverse stock split, proceeds from the sale of a residential property, and withdrawals from a self-

funded IRA are not considered income for purposes of support. The cases respondent cites are not analogous to the situation before us. For instance, in *In re Marriage of Anderson*, 405 Ill. App. 3d 1129, 1136 (2010), the court held that proceeds from a reverse stock split did not constitute income for calculating the husband's support obligation because the sale of the stock was involuntary, the stock was classified as non-marital property, cash proceeds took the place of the former shares of stock, and the cash proceeds were used to purchase another investment. *Anderson*, 405 Ill. App. 3d at 1136. The present case does not involve reinvested proceeds from the forced sale of non-marital property. In *In re Marriage of Baumgartner*, 384 Ill. App. 3d 39, 56-57 (2008), the court held that where the husband sold his residence and purchased a new home, the sale proceeds of the old residence did not constitute income for purposes of calculating a support obligation. The present case does not involve the sale of a former residence followed by the purchase of a new residence. Finally, in *In re Marriage of O'Daniel*, 382 Ill. App. 3d 845, 850 (2008), the court held that where a party withdraws money placed into an IRA, "he does not gain anything as the money was already his" and it therefore "is not a gain and not income." Respondent's reliance on *O'Daniel* is misplaced as this case does not involve the withdrawal of an IRA contribution.[1] Thus, the cases cited by respondent do not compel a finding that the trial court erred in categorizing the expat allowance and related tax-protection amounts as income for the purposes of setting his maintenance obligation.

¶ 58    Additionally, the fact that the expat allowance was being phased out and would terminate

---

[1] We also point out that *O'Daniel* directly conflicts with this court's decision in *In re Marriage of Lindman*, 356 Ill. App. 3d 462, 466-67 (2005), in which this court held that IRA disbursements are income for purposes of calculating a support obligation.

by February 2020 did not render the trial court's income determination improper. As the supreme court has stated, the relevant focus for determining income for support purposes is the obligor's financial situation at the time the support calculation is made. *Rogers*, 213 Ill. 2d at 138. In this case, the hearing on the dissolution of marriage was held early in 2019. Thus, the most recent year-end income figures available to the court were from 2018. This is what the trial court used to calculate respondent's income for setting spousal support. The trial court therefore properly focused on respondent's income from 2018—which included the expat allowance and related tax-protection amounts—in determining his income for maintenance purposes.

¶ 59    Respondent also claims that the trial court erred in finding that there was "no reason to expect that [his] annual gross income will be substantially reduced in the future." However, there is ample evidence of record to support this finding. Respondent testified that the amount of the expat allowance would be reduced by one-third each year between 2017 and 2019. In his brief, respondent represents that his expat allowance in 2017 was approximately $19,000 per month. Respondent testified that the February 2019 Expatriate Pay Detail Report listed a year-to-date expat allowance of $19,589.48. This included the January 2019 expat allowance in a higher amount plus the newly-reduced February 2019 amount of $6395.83. Thus, respondent's expat allowance for February 2018 through January 2019 would have been $13,193.65 per month.[2] In other words, respondent's 2017 expat allowance of approximately $19,000 a month was reduced in 2018 to

_____

[2] This is the difference between the year-to-date expat allowance amount of $19,589.45 as reflected on the February 2019 Expatriate Pay Detail Report and the newly-reduced February 2019 expat allowance amount of $6395.83. The $13,193.65 amount is also reflected on a pay statement dated January 31, 2019, which is included in respondent's exhibit 10 in the record on appeal.

$13,193.65 per month, a decrease of $5806.35 per month. Despite this reduction of almost $70,000 between 2017 and 2018, respondent's W-2 statements reflect that his income *increased* between 2017 and 2018 (the last full year for which W-2 statements were available at the time of trial). Respondent's W-2 form for 2017 shows Medicare wages of $769,536. His W-2 form for 2018 shows Medicare wages of $791,808, an increase of $22,272 over 2017. Thus, contrary to respondent's claim, there was evidence to support the trial court's statement that there was "no reason to expect that [his] annual gross income will be substantially reduced in the future."

¶ 60    In short, for all the foregoing reasons, we find that the trial court did not err in including respondent's expat allowance and related tax-protection amounts when calculating his available income for spousal support.

¶ 61                                2. Respondent's Income: RSUs

¶ 62    Next, respondent argues that the trial court erroneously double-counted the RSUs both as income available for support and as property that was equally divided between the parties. Respondent further argues that the trial court erred in treating the RSUs as "guaranteed" income because the RSU amounts are "variable and uncertain." Citing principally to *Pratt*, 2014 IL App (1st) 130465, *In re Marriage of Colangelo*, 355 Ill. App. 3d 383 (2005), and *In re Marriage of Klomps*, 286 Ill. App. 3d 710 (1997), petitioner responds that the RSUs that were previously allocated between the parties as marital property may also be considered "income" as they vest. Petitioner further responds that it was not improper to consider the RSUs in setting spousal support on the basis that they were variable.

¶ 63    Initially, we are unpersuaded by respondent's claim that the trial court improperly considered the RSUs in determining his available income for spousal support because the RSU amounts are "variable and uncertain." Respondent cites no authority for this proposition.

Therefore, it is forfeited. Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) (requiring the appellant's brief to include argument "which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on."); *In re Marriage of Reicher*, 2021 IL App (2d) 200454, ¶ 33 (holding that the appellant's failure to cite pertinent authority to support her arguments violates Rule 341(h)(7) and results in forfeiture). Forfeiture notwithstanding, our supreme court has found "untenable" the argument that, in determining an obligor's available income for support, non-guaranteed funds should be excluded. *Rogers*, 213 Ill. 2d at 138. The court reasoned that due to factors such as job changes, falling interest rates, and unfavorable business conditions, "[f]ew, if any, sources of income are certain to continue unchanged year in and year out." *Rogers*, 213 Ill. 2d at 138. Further, as noted earlier, the *Rogers* court held that the relevant focus in assessing an obligor's income for purposes of a support obligation is his or her economic situation at the time the support calculation is made by the trial court. *Rogers*, 213 Ill. 2d at 138. Similarly, in *In re Marriage of Lindman*, 356 Ill. App. 3d 462, 467-68 (2005), this court found unpersuasive an argument that it was unfair to include the husband's non-recurring IRA disbursements in determining his available income for support. We noted that the Act does not provide for a deduction of nonrecurring income in determining the income available for a support obligation. *Lindman*, 356 Ill. App. 3d at 467. Thus, we reasoned, "if we were to conclude that such income is, by virtue of its lack of regularity, excluded from the net income calculation, we would read into the plain language of the statute limitations and conditions not expressed by the legislature." *Lindman*, 356 Ill. App. 3d at 467. Further, citing to *Rogers*, we noted that in calculating the obligor's available income for purposes of a support obligation, the relevant inquiry focuses on the income available "at the time the determination is made." *Lindman*, 356 Ill. App. 3d at 467.

¶ 64    Turning to the facts in this case, the trial court held the dissolution hearing over several dates in March and April 2019. Thus, the most recent year-end income information available to the court would have been from 2018. Respondent concedes that the annual summary for 2018 shows that his compensation included an annual incentive award comprised of a cash component and an RSU component. Thus, the trial court properly considered the RSUs in determining respondent's available income for spousal support. Accordingly, we reject respondent's argument that, because the RSU amounts are "variable and uncertain," it was improper for the trial court to include them in his income for purposes of calculating his available income for spousal support.

¶ 65    Next, we address respondent's claim that, in calculating his available income for spousal support, the trial court erroneously double-counted the RSUs both as income available for support and as property that was equally divided between the parties. With respect to the division of the RSUs in this case, the trial court's order provides in relevant part as follows:

> "The Petitioner contends that Respondent has earned or been granted 1,174 RSU shares as of March 7, 2019, which remain unvested. 441 shares were granted on January 15, 2019; 379 shares were granted on January 16, 2018; and 354 shares were granted on January 17, 2017.
>
> The parties appear to agree that the RSUs had a value of $121,767.28 as of March 7, 2019. The Petitioner is awarded one half the value of any shares (RSUs) granted as of the date of divorce if and when they vest."

In support of his claim of "double counting," respondent contends that the dissolution judgment treated the unvested RSUs as marital property and equally allocated their value between the parties. The court then considered respondent's full W-2 wages, which includes the value of the vesting RSUs, for spousal support. Thus, respondent reasons, over the next several years, petitioner will

receive 50% of the RSU awards as a property distribution at the time they vest. However, the full value of the vesting RSUs (both those awarded to petitioner and those awarded to respondent) will be included in his W-2 wages, which the court used to calculate his available income for spousal support. As a result, respondent reasons the trial court impermissibly double counted the RSUs as both property and income.

¶ 66    In the context of a marital dissolution proceeding, "double counting" or "double dipping" occurs "when property is awarded to one spouse in an equitable distribution of marital assets and is then also considered as a source of income for purposes of imposing support obligations." ' " *In re Marriage of Eberhardt*, 387 Ill. App. 3d 226, 232 (2008) (quoting *Croak v. Bergeron*, 856 N.E. 2d 900, 903 (Mass. App. Ct. 2006) (quoting *Champion v. Champion*, 764 N.E. 2d 898, 902 (Mass. App. Ct. 2002))). Based on this definition, we agree in part with respondent's claim that double counting occurred here with respect to the RSUs. In particular, to the extent that the trial court determined respondent's available income for spousal support included the income attributable to the RSUs *awarded to petitioner*, it was error. This is because the unvested RSUs awarded to petitioner will be included in respondent's W-2 wages as ordinary income when they vest, and it is respondent's W-2 wages which the trial court used to calculate respondent's available income in determining his support obligation. Thus, property awarded to petitioner in the equitable distribution of marital assets is also considered as a source of income for purposes of imposing a support obligation. We conclude, however, it was not error for the trial court to include the income attributable to the RSUs *awarded to respondent* as this did not constitute property awarded to *petitioner*.

¶ 67    Citing principally to *Pratt*, 2014 IL App (1st) 130465, *Colangelo*, 355 Ill. App. 3d 383, and *Klomps*, 286 Ill. App. 3d 710, petitioner insists that the trial court did not err by including

RSUs that were allocated as property between the parties as income for purposes of support. As explained below, however, these three cases do not undermine our resolution of the issue.

¶ 68    In *Klomps*, the husband argued that the trial court erred in using his retirement benefits for assessing the proper amount of child support because those benefits were previously determined to be marital property and the wife was awarded a share of them in the judgment of dissolution. The appellate court rejected the husband's argument. The court's reasoning was twofold. First, the court determined that it was contrary to the clear terms of the Act, which defined "net income" for purposes of child support as " 'the total of all income from all sources,' minus certain specified deductions." *Klomps*, 286 Ill. App. 3d at 714 (quoting 750 ILCS 5/505(a)(3) (West 1992)). And, as the court noted, retirement pay of the kind received by the husband was not one of the listed deductions. *Klomps*, 286 Ill. App. 3d at 714. Second, the court found nothing in the Act to authorize excluding from the calculation of the obligor's available income for child support any income received by the obligor simply because it was previously classified as marital property. *Klomps*, 286 Ill. App. 3d at 714. The court explained that at the time of dissolution, the husband's pension constituted marital property subject to equitable distribution because it was "partially earned, with a known value, but had not yet been collected." *Klomps*, 286 Ill. App. 3d at 716. Thus, the court held that the fact the retirement benefits were classified as marital property prior to the date the husband began collecting them in monthly installments did not bar them from use in determining net income for child support. *Klomps*, 286 Ill. App. 3d at 716.

¶ 69    In *Colangelo*, as part of the division of marital property, the court awarded the husband "50% of the net value of vested stock options in [the employer] 'if & when * * * exercised' and 100% of the unvested stock options in [the employer]." The court also ordered the husband to pay monthly child support of 20% of his net monthly income plus "20% of net of any

bonus/commission/overtime received." The husband subsequently received 2286 shares of the employer's stock from the exercise of the unvested stock options. The wife filed a rule to show cause, arguing, *inter alia*, that the receipt of the stock resulted in income to the husband, upon which he refused to pay child support. The husband responded that shares of stock were marital property that had already been allocated to him. He reasoned that because the unvested options were his property, the distributions resulting from an exercise of the options could not be considered income for support purposes. The trial court agreed with the husband, and the wife appealed. On appeal, this court concluded that the trial court erred in finding that the distributions from the exercise of the stock options were not income for support purposes. *Colangelo*, 355 Ill. App. 3d at 389-92. We reasoned that "[b]ecause the unvested stock options transformed into a realized distribution, it would seem that the distribution is not marital property being counted as income, but instead the fruits of the marital property." *Colangelo*, 355 Ill. App. 3d at 389. Citing to *Klomps* and the definition of "net income" in section 505(a)(3) of the Act, we further determined that even if the stock distribution were marital property, such property can also be income for child support purposes. *Colangelo*, 355 Ill. App. 3d at 389-90 (citing *Klomps*, 286 Ill. App. 3d at 713-17 and 750 ILCS 5/505(a)(3) (West 2002)).

¶ 70    In *Pratt*, the husband challenged the trial court's calculation of his income for purposes of child support. Among other things, the husband contended that the trial court improperly included in his income $58,864 from the sale of stock options. As the *Pratt* court explained:

"[The husband] contends * * * that it is fundamentally unfair to include this income because he was awarded the restricted stock options as marital property in the dissolution judgment and, by receiving a portion of the income from the sale, [the wife] is 'double dipping.' He argues that [the wife] received her portion of the stocks as marital property

- 34 -

and now she is receiving as child support a portion of [his] income from his share. This is not 'double dipping.' The trial court can consider marital property as income for child support purposes, even if the income comes from vested stock options awarded as marital property to one of the parties." *Pratt*, 2014 IL App (1st) 130465, ¶ 31.

Thus, the *Pratt* court concluded that the trial court did not err in determining that the husband's income from the sale of the restricted stock options constituted income for child support purposes. *Pratt*, 2014 IL App (1st) 130465, ¶ 32.

¶ 71    *Klomps*, *Colangelo*, and *Pratt* support the outcome we reach in this case. In all three cases, the husbands argued that it was improper for the trial courts to include as income the proceeds from marital property awarded to each of them. The reviewing courts disagreed. In this case, we hold that, in determining respondent's available income for support, it was proper for the trial court to include the income attributable to the RSUs awarded to respondent. This is consistent with the holdings in *Klomps*, *Colangelo*, and *Pratt.* However, to the extent that these cases can be interpreted as holding that property awarded to one spouse in the equitable distribution of marital assets may also be considered as a source of income to the other spouse for purposes of imposing the other spouse's support obligation, we decline to follow those cases.[3] In short, to the extent that

--------

[3] We note for instance the *Pratt* court stated that "[t]he trial court can consider marital property as income for child support purposes, even if the income comes from vested stock options awarded as marital property to *one of the parties*." (Emphasis added.) *Pratt*, 2014 IL App (1st) 130465, ¶ 31. Under our holding, however, income attributable to the payor of support but coming from marital property awarded to the recipient of maintenance should *not* be included in calculating the payor's support obligation as this would result in double counting.

the trial court determined respondent's available income for spousal support included the income attributable to the RSU shares awarded to petitioner, it was error. However, it was not error for the trial court to include the income attributable to the RSU shares awarded to respondent.

¶ 72                                3. Amount of Maintenance

¶ 73    Next, respondent contends that the trial court abused its discretion in awarding petitioner indefinite maintenance in the amount of $15,000 per month. In support, respondent cites the court's "significant overstatement of [his] available income for purposes of support," petitioner's "erroneous and inflated financial affidavits that she herself admitted contained numerous 'errors' and repeated 'mistakes,' " petitioner's acknowledgements that the parties had "lived well but frugally" during the marriage, petitioner's testimony that respondent had always been a "saver," and petitioner's receipt of more than $1.5 million in assets. Petitioner responds that the trial court acted within its discretion when it set respondent's maintenance obligation at $15,000 per month, particularly given the standard of living the parties enjoyed during the marriage and respondent's status as a high-income earner with annual W-2 wages approaching $800,000.

¶ 74    An award of maintenance in a dissolution proceeding is governed by section 504 of the Act (750 ILCS 5/504 (West 2018)). The statute provides that a trial court "may grant a maintenance award for either spouse in amounts and for periods of time as the court deems just." 750 ILCS 5/504(a) (West 2018). Section 504(a) lists several factors that the court must consider, where relevant, when determining whether to award maintenance. 750 ILCS 5/504(a)(1)-(13) (West 2018). Those factors include: (1) the income and property of each party, including marital property apportioned to each party; (2) the needs of each party; (3) the realistic present and future earning capacity of each party; (4) any impairment to earning capacity of the party seeking maintenance because he or she devoted time to domestic duties or forewent opportunities for education or

training because of the marriage; (5) any impairment to earning capacity of the party against whom maintenance is sought; (6) the time necessary for the party seeking maintenance to acquire appropriate education, training, or employment; (7) the standard of living established during the marriage; (8) the duration of the marriage; (9) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties; (10) all sources of income; (11) the tax consequences of each party; and (12) contribution and services by the party seeking maintenance to the education, training, or career of the other party. 750 ILCS 5/504(a) (West 2018). The court may also consider any other factors it deems "just and equitable." 750 ILCS 5/504(a)(14) (West 2018).

¶ 75     If the trial court determines that maintenance is appropriate, it must determine the amount and duration of the award. 750 ILCS 5/504(b-1) (West 2018); *In re Marriage of Hamilton*, 2019 IL App (5th) 170295, ¶ 108. Generally, if the parties' combined gross annual income is less than $500,000, maintenance is calculated by using a guideline formula set forth in the Act. 750 ILCS 5/504(b-1)(1)(A) (West 2018). However, if the parties' combined gross annual income exceeds $500,000, an award of maintenance shall be made after the court's consideration of all relevant factors set forth in Section 504(a) of the Act (750 ILCS 5/504(a) (West 2018)). 750 ILCS 5/504(b-1)(2) (West 2018). The trial court assesses the statutory factors in light of the reasonable needs of the party seeking maintenance, as measured by the standard of living the parties enjoyed during the marriage. See *In re Marriage of Blume*, 2016 IL App (3d) 140276, ¶ 51; *Micheli*, 2014 IL App (2d) 121245, ¶¶ 19-20. In this case, we note that the court found that the parties' combined gross annual income exceeded $500,000. Thus, a non-guidelines award was made.

¶ 76     As a general matter, a trial court's award of maintenance is presumed to be correct. *In re Marriage of Brill*, 2017 IL App 92d) 160604, ¶ 26. The amount of a maintenance award lies within

the sound discretion of the trial court and a court of review will not reverse that decision unless it constitutes an abuse of discretion. *In re Marriage of Schneider*, 214 Ill. 2d 152, 173 (2005). An abuse of discretion occurs when a trial court's finding is arbitrary or fanciful or where no reasonable person would agree with the trial court's decision. *Brill*, 2017 IL App (2d) 160604, ¶ 26. With these principles in mind, we address respondent's assignments of error.

¶ 77    Respondent contends that the trial court abused its discretion in awarding petitioner indefinite maintenance in the amount of $15,000 per month because of the court's "significant overstatement of [his] available income for purposes of support." We previously rejected respondent's claim that the trial court erred in including in his available income for support the expat allowance and related tax-protection amounts. As such, we determine that this cannot provide a basis for finding that the trial court abused its discretion in determining the amount of the maintenance award based on an overstatement of income. Moreover, for the reasons explained below, while the trial court erred in considering income from the vesting of the RSUs awarded to petitioner as a source of income for purposes of respondent's support obligation, we conclude that any error in the calculation of respondent's available income for his support obligation was *de minimis* and therefore provides no basis upon which to modify the maintenance award.

¶ 78    As noted earlier, in the judgment of dissolution, the trial court found that as of March 7, 2019, respondent had been granted 1174 RSU shares which remained unvested. Of these shares, 354 shares were granted on January 17, 2017, 379 shares were granted on January 16, 2018, and 441 shares were granted on January 15, 2019.[4] The court awarded petitioner "one half the value

---

[4] According to respondent's brief, 707 RSU shares had been awarded in 2017, 354 of which "remained outstanding" and will vest in 2020.

of any shares (RSUs) granted as of the date of divorce if and when they vest." The RSU shares are subject to a three-year vesting schedule, pursuant to which no shares vest the first year after the grant, 50% of the shares vest the second year, and 50% of the shares vest the third year. Thus, pursuant to this vesting schedule, the unvested RSU shares at issue will vest as follows: (1) the 354 RSU shares granted in 2017 will vest in 2020; (2) half of the 379 RSU shares granted in 2018 with vest in 2020 and the other half will vest in 2021; and (3) half of the 441 RSU shares granted in 2019 will vest in 2021 and the other half will vest in 2022 (provided respondent is still employed by JP Morgan Chase at these times). Further, as they vest, the value of the RSU shares awarded will be included as ordinary income in respondent's W-2 for these three years. According to the dissolution judgment, the parties "appear[ed] to agree" that the 1174 RSU shares had a value of $121,767.28 as of March 7, 2019. Thus, each unvested share was valued at $103.72, and the value of the shares awarded to each party was $60,883.64. This means that the income attributable to the RSU shares awarded to petitioner to be included as ordinary income in respondent's W-2 wages is $28,185.91 for the shares scheduled to vest in 2020, $21,262.60 for the shares scheduled to vest in 2021, and $11,435.13 for the shares scheduled to vest in 2022.[5]

---

[5] For the shares vesting in 2020, the calculation of the value of petitioner's RSU shares is as follows: (1) 177 shares granted in 2017 at $103.72 per share ($18,358.44) plus (2) 94.75 shares granted in 2018 at $103.72 per share ($9827.47). For the shares vesting in 2021, the calculation of the value of petitioner's RSU shares is as follows: (1) 94.75 shares granted in 2018 at $103.72 per share ($9827.47) plus (2) 110.25 shares granted in 2019 at $103.72 per share ($11,435.13). For the shares vesting in 2022, the calculation of the value of petitioner's RSU shares is 110.25 shares granted in 2019 at $103.72 per share ($11,435.13).

¶ 79    Based on the foregoing, we disagree with respondent's claim that the trial court's error in including the value of the RSU shares awarded to petitioner in determining his available income for support purposes constituted a "significant" overstatement. The trial court determined respondent's available income for support purposes based on his 2018 W-2 statement, which was the most recent calendar-year W-2 available at the time of trial. The 2018 W-2 reflected that respondent's Medicare wages for that year totaled $791,808. Thus, the $28,185.91 in income attributable to the RSU shares awarded to petitioner and vesting in 2020 represents only 3.6% of respondent's 2018 W-2 Medicare wages. Similarly, the $21,262.60 attributable to the RSU shares awarded to petitioner and vesting in 2021 represents only 2.7% of respondent's 2018 W-2 Medicare wages. Finally, the $11,435.13 attributable to the RSU shares awarded to petitioner and vesting in 2022 represents only 1.4% of respondent's 2018 W-2 Medicare wages. Given these circumstances, we conclude that the amount of the overstatement is *de minimis*. We also point out, as did the trial court in its ruling on respondent's motion to reconsider, the income attributable to the RSU shares awarded to petitioner will only overstate income to respondent until 2022, at which time they will have all vested. Accordingly, while the trial court overstated respondent's available income for purposes of support with respect to the RSU shares, the error does not require a remand for a modification of the award as the error was *de minimis*. See, *e.g.*, *In re Marriage of Heroy*, 385 Ill. App. 3d 640, 664 (2008) (holding that trial court's failure to consider $145,000 shareholder loan as part of marital estate was harmless in light of $8.7 million valuation of marital estate); *In re Marriage of Alexander*, 368 Ill. App. 3d 192, 205 (2006) (concluding that error in valuation of property was *de minimis* and did not require reversal)), *In re Marriage of Wilder*, 122 Ill. App. 3d 338, 344-45 (1983) (noting that a trial court's error warrants reversal only where a party has been prejudiced or it appears that the outcome might have been different had the error not occurred).

¶ 80    We turn next to respondent's claim that the trial court abused its discretion in awarding

petitioner indefinite maintenance in the amount of $15,000 per month because of petitioner's

"erroneous and inflated financial affidavits that she herself admitted contained numerous 'errors'

and repeated 'mistakes.' " At the outset, we observe that the trial court was aware of the

inaccuracies in petitioner's financial affidavits as this evidence was brought out at trial.

Notwithstanding any errors in petitioner's financial affidavits, the trial court independently heard

the evidence as to the factors set forth in section 504(a) of the Act, including, *inter alia*, the parties'

income, needs, earning capacity, and the standard of living enjoyed during the marriage. In this

regard, the record establishes that the parties were married for 30 years and both are in good health.

The parties enjoyed a comfortable standard of living during the marriage. They lived in

Switzerland for the latter part of the marriage. They traveled extensively, both in the United States

and internationally. They had luxury vehicles, and, according to petitioner, respondent frequently

bought her jewelry during the marriage. At the time of trial, petitioner was 55 years of age and

respondent was 56 years of age. Respondent is a college graduate and had been gainfully employed

throughout the marriage, principally as a banker. Petitioner holds a GED. During the marriage,

petitioner worked principally as a homemaker and a caretaker to the parties' four children.

Although she worked outside the home at the start of the marriage, petitioner has not held a wage-

paying job outside the home since 1998, when she left work as a part-time salesperson for a

clothing retailer. Petitioner's highest salary when she worked outside the home was about $30,000

per year. As reflected on his W-2 statements, respondent's income has consistently risen from

about $683,482 in 2015 to $791,808 in 2018. In light of the foregoing, we cannot say that any

errors or mistakes on petitioner's financial affidavits compel a finding that the trial court abused

its discretion in awarding petitioner maintenance in the amount of $15,000 per month. See *In re*

*Marriage of Harms*, 2018 IL App (5th) 160472, ¶ 36 (holding that where a court considers the required statutory factors and does not abuse its discretion, maintenance award will be affirmed).

¶ 81    Finally, respondent contends that the trial court abused its discretion in awarding petitioner indefinite maintenance in the amount of $15,000 per month because the parties had lived "frugally" during the marriage, respondent had always been a "saver," and petitioner received more than $1.5 million in assets. While the parties may have lived "frugally" during the marriage and there was testimony that respondent was a "saver," the evidence presented at trial, as set forth in the previous paragraph, reflects that they lived well and enjoyed a comfortable standard of living. Moreover, the fact that petitioner received $1.5 million in assets does not provide a basis for overturning the maintenance award. "A party should not be required to expend [his or] her assets in order to live at something approximating the standard of living enjoyed during the marriage." *In re Marriage of Hamilton*, 2019 IL App (5th) 170295, ¶ 104. In the judgment of dissolution, the trial court expressly stated that it had heard and considered the evidence and the testimony of the parties and that it had considered the applicable statutes and case law. A review of the record and the trial court's ruling demonstrates that the trial court considered the marital property apportioned to petitioner in setting the amount of maintenance as well as the other applicable factors. For the reasons set forth above, we therefore conclude that the trial court did not abuse its discretion in awarding petitioner indefinite maintenance in the amount of $15,000 per month.

¶ 82                                    4. Motion to Reconsider

¶ 83    Finally, respondent argues that the trial court erred in denying his motion to reconsider with respect to the calculation of his available income for support. Petitioner disagrees, contending that the trial court's order denying respondent's motion to reconsider was not improper.

¶ 84    "The purpose of a motion to reconsider is to bring to the trial court's attention a change in

the law, an error in the trial court's previous application of existing law, or newly discovered evidence that was not available at the time of the prior hearing or decision." See *Horlacher v. Cohen*, 2017 IL App (1st) 162712, ¶ 79. Where a motion to reconsider rests upon an alleged misapplication of existing law, review is *de novo*. *Spencer v. Wayne*, 2017 IL App (2d) 160801, ¶ 25. Where the motion to reconsider is based upon a claim of newly discovered evidence, the standard of review is abuse of discretion. *Horlacher*, 2017 IL App (1st) 162712, ¶ 80. As noted previously, an abuse of discretion occurs when a trial court's finding is arbitrary or fanciful or where no reasonable person would agree with the trial court's decision. *Brill*, 2017 IL App (2d) 160604, ¶ 26.

¶ 85    In requesting reconsideration, respondent alleged that the trial court had erroneously: (1) applied existing law in overstating his income available for support at $791,808 (the amount reflected on his 2018 W-2 statement) despite evidence that this amount included benefits in the form of his expat allowance and related tax-protection amounts, which were set to terminate in February 2020; (2) double-counted the RSUs as both property and income; and (3) set the amount of maintenance based upon the incorrect and inflated amount of his income, thereby providing petitioner with a windfall. In his motion to supplement his motion to reconsider, respondent presented "new" information regarding his income. Specifically, respondent contended that his gross income from all employment sources "dropped by $145,979, from $575,623 to $429,643, a 25% decrease," based on a comparison of the year-to-date income amounts reflected on his pay statements for the periods ending June 30, 2018, and June 30, 2019.[6]    Respondent further

---

[6] In his brief, respondent represents that the year-to-date income on the pay statement for the period ending on June 30, 2019, is $428,643. However, our review of the pay statement

contended that these pay statements also established that his RSU income had declined by $63,236 and his expat allowance had declined by $75,087 during the same period.

¶ 86   In ruling on the motion to reconsider, the trial court granted respondent relief on several claims not at issue in this appeal, but rejected respondent's arguments as to the claims that are at issue here. In denying respondent's request to reconsider its income finding, the court held: (1) calculating maintenance only on respondent's base salary "would require the parties to at least annually determine how much of the Respondent's bonuses and [RSUs] should be paid to the Petitioner * * * and would almost certainly set the parties up for protracted and frequent post-decree litigation"; (2) although respondent's expat allowance had been decreasing for several years, he earns more income and therefore the expiration of the expat allowance was "not certain to negatively affect" respondent's income based on his past income history; (3) because respondent has historically received cash bonuses and RSUs, there is no reason why he would not receive them in the future; and (4) because respondent had a history of "saving," he could budget for his monthly maintenance payments despite receiving his bonuses and RSUs only once per year. In addition, the court held that if the award of 50% of the RSUs as property to petitioner while also using their value to determine respondent's available income for support was "a double hit" to him, "it appears to be similar to a disproportionate division of the marital estate and will only be a double hit for the first three years of Respondent's maintenance obligation."

¶ 87   In this appeal, respondent contests the trial court's findings in ruling on his motion to reconsider. Respondent initially submits that the trial court's desire to prevent possible future litigation does not erase the need to correct the numerous errors made in the dissolution judgment.

––––––––––––––––––––––––

indicates that it is $1000 higher, or $429,643.

Respondent points out that domestic relations courts routinely enter orders that require annual true-ups between parties precisely because of the uncertain or fluctuating nature of the payor's stream of income. See, *e.g.*, *In re Marriage of Connelly*, 2020 IL App (3d) 180193, ¶ 25 (noting that marital settlement agreement incorporated into the dissolution judgment contained a true-up provision requiring former husband to pay 28% of any income earned over the $100,000 annual salary he earned at the time of the judgment); *In re Marriage of Miller*, 2015 IL App (2d) 140530, ¶ 4 (noting that former husband was ordered to pay permanent maintenance at a rate of 41.44% of his income for the first four years and 21.44% of his income thereafter; former wife was paid $3000 monthly, with an annual true-up depending upon the size of the former husband's annual bonus). He argues that the trial court's rationale does not directly address his claim that the court overstated his available income for purposes of support. Similarly, respondent argues that the trial court's comments that he has a history of saving and therefore could budget for the maintenance payments do not address the errors it committed.

¶ 88    We review the ultimate decision of the court rather than the reasoning that produced it. *In re Marriage of Heindl*, 2014 IL App (2d) 130198, ¶ 31. As we have concluded earlier, the trial court did not err in considering respondent's expat allowance and related tax-protection amounts in calculating his available income for purposes of support. Indeed, despite the trial court's statements in ruling on respondent's motion to reconsider, it could reasonably conclude that there was insufficient evidence that respondent's wages were uncertain or fluctuating. As the trial court suggested, although respondent's expat allowance had been decreasing for several years, the evidence established that his income had been increasing. As noted earlier, the evidence of record supports this conclusion. Despite the decrease in the expat allowance, the Medicare wages reflected on respondent's W-2 statements for the years 2015 through 2018 (the most recent full-

year statement available at the time of trial) showed that respondent's income steadily increased on a year-over-year basis. Respondent's Medicare wages were $683,482 in 2015, $718,690 in 2016, $769,536 in 2017, and $791,808 in 2018. Indeed, despite respondent's testimony that each year between 2017 and 2019 the expat allowance would be reduced by 33% effective with the February payroll, the Medicare wages as reflected on his W-2 statement reflect an *increase* of more than $20,000 between 2017 and 2018. Based on this record, even though respondent's expat allowance was being phased out, the trial court could reasonably conclude that it did not have a negative impact on respondent's wages. Thus, the trial court's finding that the decrease in respondent's expat allowance is "not certain to negatively affect the Respondent's income based on his past income history" does not provide a basis for overturning the trial court's findings on reconsideration and its decision to deny the motion to reconsider on this basis was not against the manifest weight of the evidence.

¶ 89    Respondent also contends that the trial court abused its discretion by failing to acknowledge the new evidence he submitted on reconsideration that showed he experienced a 25% decrease in his income between June 30, 2018, and June 30, 2019. According to respondent, the court "gave no indication that it considered all of the evidence presented by [him] that more accurately reflected his current income and prevented it from being artificially inflated." More to the point, respondent asserts that "nowhere did the Court acknowledge that between June 30, 2018, and June 30, 2019, [his] year-to-date gross income from all employment sources * * * had declined by $145,979, mostly due to a reduction in his RSU payments * * * and in his expat allowance." We disagree that the trial court failed to consider this evidence. The opening paragraph of the court's ruling on the motion to reconsider states as follows:

    "This matter comes before the Court on the Respondent's Motion to Reconsider the

Court's decision of June 3, 2019, entered June 10, 2019, the parties having argued the motion May 3, 2019, and *the Court having taken the matter under advisement to consider the pleadings and arguments of the attorneys on behalf of the parties*." (Emphasis added.) Although the trial court did not expressly discuss the supplemental income evidence respondent submitted, the italicized language from the court's order belies respondent's claim that the trial court did not consider the supplemental income evidence, which was set forth in its pleadings and argued at the hearing on the motion to reconsider. Thus, contrary to respondent's claim, we find that the trial court considered the supplemental income evidence.

¶ 90 Finally, with respect to his argument regarding the unvested RSUs, respondent contends that the trial court "appears to concede the existence of the impermissible double count by stating that '[i]f the award to Petitioner is a double hit to Respondent, it appears to be similar to the disproportionate division of the marital estate and will only by a double hit for the first three years of Respondent's maintenance obligation." Having acknowledged the correctness of respondent's argument on this claim, we need not address the propriety of the trial court's remarks upon rehearing.

¶ 91 For the reasons set forth above, we therefore find that the trial court did not err in denying respondent's motion to reconsider.

¶ 92 B. Pre-marital Contributions to Retirement Accounts

¶ 93 Respondent's next argument concerns the trial court's ruling that the non-marital portion of his JP Morgan Chase 401(k) and IRA accounts was limited to the contributions he made to the accounts prior to the parties' marriage. According to respondent, the trial court erred in rejecting his estimate that the $20,000 in pre-marital funds he contributed to the retirement accounts grew to $389,000 over the course of the parties' 30-year marriage based upon his analysis of the rates

of return of the S&P 500 during that period. Respondent further contends that the court's error in failing to attribute any gain to his non-marital contributions tainted its valuation and division of property, thereby resulting in an overstated amount of marital retirement funds. Petitioner responds that the trial court did not abuse its discretion by not attributing gain to respondent's pre-marital retirement assets because respondent failed to present any credible evidence in support of his claim.

¶ 94 The classification and disposition of property in a dissolution-of-marriage case is governed by section 503 of the Act (750 ILCS 5/503 (West 2018)); *In re Marriage of James*, 2018 IL App (2d) 170627, ¶ 20. All property of the parties to a marriage belongs to one of three estates: (1) the husband's estate; (2) the wife's estate; or (3) the marital estate. *In re Marriage of Werries*, 247 Ill. App. 3d 639, 641-42 (1993). Before a court may dispose of property upon the dissolution of the marriage, it must determine to which of these estates the property belongs. *In re Marriage of Henke*, 313 Ill. App. 3d 159, 166 (2000). After the trial court classifies the property, it awards each spouse his or her non-marital property and divides the marital property in "just proportions." 750 ILCS 5/503(d) (West 2018); *James*, 2018 IL App (2d) 170627, ¶ 20. The trial court must make specific factual findings as to its classification of assets as marital or non-marital property. 750 ILCS 5/503(a) (West 2018). The trial court's classification of property as marital or non-marital will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re Marriage of Romano*, 2012 IL App (2d) 091339, ¶ 44; *In re Marriage of Heroy*, 385 Ill. App. 3d 640, 669 (2008). The reason for this deferential standard of review is that the characterization of an asset typically depends upon assessing and weighing the credibility of the witnesses. *In re Marriage of Joynt*, 375 Ill. App. 3d 817, 819 (2007). Similarly, the valuation of property is a question of fact, and a trial courts determination of value will be reversed only where it is contrary

to the manifest weight of the evidence. *In re Marriage of Vucic*, 216 Ill. App. 3d 692, 703 (1991). A decision is against the manifest weight of the evidence only when an opposite conclusion is clearly apparent or when the court's findings appear to be unreasonable, arbitrary, or not based on the evidence. *Romano*, 2012 IL App (2d) 091339, ¶ 44.

¶ 95    Section 503(b)(1) of the Act (750 ILCS 5/503(b)(1) (West 2018)) creates a rebuttable presumption that all property acquired after the date of the marriage and before a judgment of dissolution of marriage is marital property regardless of the manner in which title is held. *Romano*, 2012 IL App (2d) 091339, ¶ 45. Similarly, section 503(b)(2) of the Act (750 ILCS 5/503(b)(2) (West 2018)) provides that "all pension benefits (including pension benefits under the Illinois Pension Code, defined benefit plans, defined contribution plans and accounts, individual retirement accounts, and non-qualified plans) acquired by or participated in by either spouse after the marriage and before a judgment of dissolution of marriage * * * are presumed to be marital property." These statutory presumptions may be overcome by a showing of clear and convincing evidence that the property falls within one of the exceptions listed in section 503(a) of the Act (750 ILCS 5/503(a) (West 2018)). 750 ILCS 5/503(b)(1), (b)(2) (West 2018); *In re Marriage of Budorick*, 2020 IL App (1st) 190994, ¶ 41; *In re Marriage of Dann*, 2012 IL App (2d) 100343, ¶ 63; *Romano*, 2012 IL App (2d) 091339, ¶ 45. Among these exceptions are:

> "(6) property acquired before the marriage, except as it relates to retirement plans that may have both marital and non-marital characteristics; [and]
>
> * * *
>
> (7) the increase in value of non-marital property, irrespective of whether the increase results from a contribution of marital property, non-marital property, the personal effort of a spouse, or otherwise, subject to the right of reimbursement provided in

subsection (c) of this Section." 750 ILCS 5/503(a)(6), (7) (West 2018).

Clear and convincing evidence is a higher standard of proof than a preponderance of the evidence but not quite as high as the beyond-a-reasonable-doubt standard in criminal cases. *In re Marriage of Wechselberger*, 115 Ill. App. 3d 779, 786 (1983). The burden of proof is on the party claiming that the property is nonmarital. *James*, 2018 IL App (2d) 170627, ¶ 28. Any doubts as to the nature of the property are resolved in favor of a finding that the property is marital. *In re Marriage of Dhillon*, 2014 IL App (3d) 130653, ¶ 24.

¶ 96    Thus, for respondent to prevail, he was required to prove by clear and convincing evidence that his $20,000 of non-marital retirement funds grew to $389,000 during the parties' 30-year marriage. The trial court found that respondent failed to carry his burden. The court reasoned that respondent presented "no evidence * * * of how the $20,000 was invested or how much it grew from year to year." The court further remarked that respondent's "estimate of the current value of his non-marital contribution is, as an estimate with no other clear and convincing evidence, speculative." Based on the evidence of record, we cannot say that the trial court's finding that respondent failed to prove by clear and convincing evidence that his $20,000 in pre-marital contributions to the JP Morgan Chase 401(k) and IRA accounts grew to $389,000 was against the manifest weight of the evidence.

¶ 97    As the trial court correctly observed, there was no evidence of how the $20,000 was invested over time or how the funds grew from year to year. Respondent based his estimate of the value of the pre-marital contributions on the "time value of money theory," pointing to his testimony that he never withdrew any money from the accounts and always reinvested any earnings, and using the rate of return for the S&P 500 over the 30-year term of the parties' marriage. However, respondent introduced no evidence that over this period the pre-marital

contributions were invested in a fund that tracks the S&P 500. Indeed, respondent introduced two documents showing how the funds in the JP Morgan Chase 401(k) and IRA were invested. Respondent introduced an "account overview" from March 2019 for the JP Morgan Chase 401(k) account. That document shows that as of that point in time, the funds in the JP Morgan Chase 401(k) were divided into eight separate investments—an intermediate bond fund (0.91%), a high-yield bond fund (4.42%), a large cap value index fund (33.29%), a large cap growth index fund (26.97%), a small cap index fund (12.8%), an international large cap index fund (6.88%), an international small cap index fund (6.95%), and the JP Morgan Chase common stock fund (7.78%). Respondent also introduced an account statement from February 2019 for the JP Morgan Chase IRA. That document shows that as of that point in time, the funds in the JP Morgan Chase IRA were divided into: (1) United States large cap stocks (62%); (2) United States small cap stocks (2%); (3) non-United States stocks (13%); (4) emerging market stocks (9%); (5) gold (10%); and (6) cash (4%). Based on respondent's failure to show that his $20,000 in pre-marital contributions to his retirement plans were invested in funds that tracks the S&P 500 as well as his failure to introduce evidence as to how the funds grew from year to year, the trial court reasonably concluded that respondent failed to present clear and convincing evidence that the current value of his pre-marital contributions to the retirement accounts had grown to $389,000 over the course of the parties' 30-year marriage based upon his analysis of the rates of return of the S&P 500 during that period. See *In re Marriage of Malters*, 133 Ill. App. 3d 168, 180 (1985) (noting that to correctly evaluate assets, the trial court must have before it competent evidence of value).

¶ 98    Nevertheless, respondent argues that the trial court erroneously rejected his estimate given his "career-long expertise in high-level banking" and the fact that his testimony was "unrebutted." As noted above, however, it was within the province of the trial court to assess and weigh the

credibility of the witnesses. *Joynt*, 375 Ill. App. 3d 817, 819 (2007). The trial court was not obligated to accept respondent's testimony, even if unrebutted, especially since it was not supported by any competent evidence. Indeed, when sitting as the trier of fact, a trial court is entitled to accept as much or as little of a witness's testimony as it wants. See, *e.g.*, *Kraft Foods, Inc. v. Illinois Property Tax Appeal Board*, 2013 IL App (2d) 121031, ¶ 58 (rejecting proposition that a trier of fact must accept certain testimony because it is unrebutted since doing so would remove some of the discretion from the trier of fact as to how much weight should be afforded various evidence); *Franciscan Communities, Inc. v. Hamer*, 2012 IL App (2d) 110431, ¶ 47 (noting that the trier of fact is free to disbelieve any witness).

¶ 99　　Citing various cases, respondent also contends that ownership alone is sufficient to establish a basis for his opinion. While there is authority for the proposition that a property owner may be competent to testify as to the value of his property, a court is not required to defer to an owner's opinion as to value. See *Vucic*, 216 Ill. App. 3d at 703 (noting that the general rule in Illinois is that a property owner is competent to render an opinion as to the value of his or her property but the rule is not absolute). More significantly, respondent did not attempt to testify as to the value of his property in this case. Rather, he attempted to invoke an economic analysis to show the *gain in value* of property over a course of 30 years. This is very different than placing a value on an asset at the time of trial. As such, this argument is not well taken.

¶ 100　Respondent maintains that a court may take judicial notice of the fair earning power of money or invested capital over a certain period. See *In re Marriage of Ryman*, 172 Ill. App. 3d 599, 612 (1988). Respondent further maintains that once the trial court found that he "seeded the retirement accounts with $20,000 of his non-marital money, it is unreasonable to then deny that these funds experienced *any* growth over the past 30 years, especially where an experienced

international banker was directing the investments." (Emphasis in original.) As noted above, however, it was respondent's burden to prove by clear and convincing evidence the gain in value of his initial contributions to the retirement accounts. As the trial court reasonably found, respondent failed to present any competent evidence of how the $20,000 was invested or how much it grew from year to year. Thus, the trial court did not err in rejecting his testimony regarding the gain in value of the pre-marital retirement contributions.

¶ 101   Respondent complains that the trial court's statement that his pre-marital contributions to the retirement accounts "may have been completely lost during the recession of approximately 2007 to 2012" amounted to speculation. Respondent's argument is not well taken for two principal reasons. First, it ignores the facts that the trial court classified respondent's $20,000 in pre-marital contributions to the retirement accounts as his non-marital property. Thus, contrary to respondent's claim that court did not find that his pre-marital contributions were lost. Second, and more significantly, the trial court did not award respondent any gain on the pre-marital contribution because the court found that respondent failed to present any evidence "of how the $20,000 was invested or how much it grew from year to year." As noted above, this was a reasonable conclusion based on the evidence of record.

¶ 102   Finally, respondent argues that the trial court erred in denying his motion to reconsider. However, respondent's argument is based on the same reasons raised above. Having rejected the underlying contentions, we also reject respondent's arguments directed to the trial court's decision to deny respondent's motion to reconsider on this issue.

¶ 103                               C. Attorney Fees

¶ 104   Lastly, respondent argues that the trial court erred in ordering him to pay a portion of petitioner's attorney fees. Specifically, respondent contests (1) the court's ruling in the judgment

of dissolution that he contribute $12,500 to petitioner's attorney fees pursuant to section 503(j) of the Act (750 ILCS 5/503(j) (West 2018)) and (2) the court's ruling on September 23, 2019, that he pay the additional sum of $24,746 in attorney fees to petitioner pursuant to section 508(b) of the Act (750 ILCS 5/508(b) (West 2018)). Petitioner responds that the trial court acted within its discretion to award her attorney fees. We address each of respondent's contentions separately.

¶ 105                                1. Section 503(j) Attorney Fees

¶ 106   Respondent initially argues that the trial court erroneously ordered him to contribute $12,500 to petitioner's attorney fees. Specifically, respondent asserts that although the trial court initially determined in the dissolution judgment that each party was to pay their own fees, it then also ordered him to contribute $12,500 toward petitioner's fees without explaining the basis for doing so. Respondent contends that it was petitioner who unnecessarily drove up the fees in this case, causing him to file a petition for contribution to attorney fees and costs and for sanctions against her. Petitioner responds that the trial court did not abuse its discretion in ordering respondent to contribute $12,500 to her attorney fees because her "ability to pay her attorney's fees pales in comparison to [respondent's]."

¶ 107   Generally, each party is responsible for his or her attorney fees. *In re Marriage of Mantei*, 222 Ill. App. 3d 933, 941 (1991). The Act, however, allows a party to petition for attorney fees in certain circumstances. Specifically, section 508(a) of the Act provides, in relevant part:

> "The court from time to time, after due notice and hearing, and after considering the financial resources of the parties, may order any party to pay a reasonable amount for his own or the other party's costs and attorney's fees. * * * At the conclusion of any pre-judgment dissolution proceeding under this subsection, contribution to attorney's fees and costs may be awarded from the opposing party in accordance with subsection (j) of Section

503 and in any other proceeding under this subsection." 750 ILCS 5/508(a) (West 2018). In turn, section 503(j)(2) of the Act indicates that "[a]ny award of contribution to one party from the other party shall be based on the criteria for division of marital property under this Section 503 and, if maintenance has been awarded, on the criteria for an award of maintenance under Section 504." 750 ILCS 5/503(j)(2) (West 2018). Thus, in awarding attorney fees under section 508 of the Act, the trial court must "(1) 'consider[] the financial resources of the parties' and (2) make its decision on a petition for contribution 'in accordance with subsection (j) of Section 503.' " *Heroy*, 2017 IL 120205, ¶ 19 (quoting 750 ILCS 5/508(a) (West 2014)). We review an award of attorney fees for an abuse of discretion. *Micheli*, 2014 IL App (2d) 121245, ¶ 45. Under this standard, we will reverse only if no reasonable person could agree with the trial court. *In re Marriage of Keller*, 2020 IL App (2d) 180960, ¶ 11.

¶ 108   Initially, respondent complains that the trial court did not explain the basis for its decision ordering him to contribute $12,500 to petitioner's attorney fees. However, when a trial court's order does not contain the basis for its ruling, the reviewing court presumes that the trial judge knew the law and applied it properly. *In re Marriage of Kane*, 2016 IL App (2d) 150774, ¶ 24. The presumption is overcome when the record contains "strong affirmative evidence" showing the trial court did not know or did not apply the law. *People v. Howery*, 178 Ill. 2d 1, 32 (1997). Here, in ordering respondent to contribute $12,500 to petitioner's attorney fees, the trial court's order expressly states that it had "heard and considered the evidence and the testimony of witnesses (the parties) and considered the applicable statutes and case law." Further, respondent does not direct us to "strong affirmative evidence" that the trial court did not know or apply the law. We therefore conclude that the trial court's failure to expressly set forth a basis for its order does not compel reversal of the trial court's ruling that respondent contribute $12,500 to petitioner's attorney fees.

¶ 109 Moreover, we conclude that the trial court did not abuse its discretion in ordering respondent to contribute $12,500 to petitioner's attorney fees. As noted above, a contribution award is based on the financial resources of the parties, the criteria for the division of marital property, and, where maintenance has been awarded, the criteria for an award of maintenance. 750 ILCS 5/503(j)(2) (West 2018); *Heroy*, 2017 IL 120205, ¶ 19 (quoting 750 ILCS 5/508(a) (West 2014)). Section 503(d) of the Act lists 12 factors to be considered when dividing marital property, including: (1) each party's contribution to the acquisition, preservation, or increase or decrease in value of the marital or non-marital property, including a party's contribution as a homemaker or to the family unit; (2) the dissipation of marital property by the parties; (3) the value of the property assigned to each party; (4) the duration of the marriage; (5) the economic circumstances of each party; (6) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties; (7) the custodial provisions for any children; (8) whether maintenance was awarded; (9) each party's opportunity for future acquisition of income and capital; and (10) the tax consequences of the property division upon each party. 750 ILCS 5/503(d) (West 2018). When maintenance has been awarded, the court should also consider the 14 factors set forth in section 504(a) of the Act, including: (1) the income and property of each party, including marital property apportioned to each party; (2) the needs of each party; (3) the present and future earning capacity of each party; (4) any impairment to earning capacity of the party seeking maintenance because he or she devoted time to domestic duties or forewent opportunities for education or training because of the marriage; (5) any impairment to earning capacity of the party against whom maintenance is sought; (6) the time necessary for the party seeking maintenance to acquire appropriate education, training, or employment; (7) the standard of living established during the marriage; (8) the duration of the marriage; (9) all sources

of income; (10) contribution and services by the party seeking maintenance to the education, training, or career of the other party; and (11) any other factor that the court expressly finds to be just and equitable. 750 ILCS 5/504(a) (West 2018).

¶ 110   In this case, respondent does not argue that the financial resources of the parties, the criteria for the division of marital property, or the criteria for an award of maintenance weigh against an award of contribution to petitioner's attorney fees. Rather, he contends that it was petitioner who unnecessarily drove up the fees in this case, causing him to file a petition for contribution to his attorney fees and costs and for sanctions against her. See *In re Marriage of Patel*, 2013 IL App (1st) 112571, ¶ 117 (observing that when considering a petition to allocate attorney fees, the trial court may also consider whether one party unnecessarily increased the cost of litigation because it is relevant to the division of property and the allocation of attorney fees). In support of this contention, respondent asserts that petitioner's testimony at trial regarding her two financial affidavits was repeatedly impeached and her dissipation claim was "riddled with countless 'mistakes.' " However, the court was aware of the inaccuracies in petitioner's financial affidavits and her admitted mistakes in the dissipation claim as this evidence was brought out at trial. Further, we observe that the trial court also found respondent's dissipation claim inaccurate, writing that "[a]ll of the expenses by the Petitioner that are the basis of the Respondent's claim of dissipation appear to be expenses by the Petitioner for her needs and those of the children and none appear excessive in light of the lifestyle of the parties, and especially the Petitioner, enjoyed during the marriage." Given this record, respondent's argument that petitioner was solely responsible for driving up the fees in this case is not well taken.

¶ 111   More significantly, an examination of the financial resources of the parties, the criteria for the division of marital property, and the criteria for an award of maintenance, which, as noted

previously, respondent does not address, leads us to conclude that the trial court's ruling did not constitute an abuse of discretion. The record establishes that the parties were married for 30 years and both are in good health. The parties enjoyed a comfortable standard of living during the marriage, including luxury vehicles, jewelry, and extensive domestic and international travel. At the time of trial, petitioner was 55 years of age and respondent was 56 years of age. Respondent is a college graduate and had been gainfully employed throughout the marriage, principally as a banker. Petitioner holds a GED. During the marriage, petitioner worked principally as a homemaker and a caretaker to the parties' four children. Although she worked outside the home at the start of the marriage, petitioner has not held a wage-paying job outside the home since 1998, when she left work as a part-time salesperson for a clothing retailer. Petitioner's highest salary when she worked outside the home was about $30,000 per year. As reflected on his W-2 statements, respondent's income has consistently risen from about $683,482 in 2015 to $791,808 in 2018. The court awarded petitioner maintenance of $15,000 per month. The court awarded respondent $20,000 in non-marital property, the parties' time share property in Orlando, Florida (valued at $11,500), a 2011 Mercedes Benz, a leased BMW, and the bank accounts in his name. The court awarded petitioner a 2007 BMW, the bank accounts in her name, and $166,380, representing one-half of the amount dissipated by respondent. The court divided the remainder of the marital property (mainly the retirement accounts) evenly between the parties. As the foregoing establishes, respondent clearly has the financial ability to contribute $12,500 toward petitioner's attorney fees given, *inter alia*, his financial resources, his present and future earning capacity, and his opportunity for future acquisition of capital assets and income. Considering this record, we simply cannot say that no reasonable person could agree with the trial court. Accordingly, the trial court did not abuse its discretion in ordering respondent to contribute $12,500 to petitioner's

attorney fees.

¶ 112                             2. Section 508(b) Attorney Fees

¶ 113   Respondent also argues that the trial court erroneously ordered him to pay the additional

sum of $24,746 in attorney fees to petitioner pursuant to section 508(b) of the Act (750 ILCS

5/508(b) (West 2018)). In support of this argument, respondent contends: (1) he did not violate

any court order so as to support the imposition of attorney fees pursuant to section 508(b); (2) the

trial court did not make a specific finding that he had engaged in an "improper purpose" to support

the imposition of attorney fees pursuant to section 508(b); and (3) the trial court refused to inquire

as to the specific work done by petitioner's counsel to support the fee request or determine whether

such fees were reasonable for that work. Petitioner responds that it was within the discretion of the

trial court to order respondent to pay $24,746 in attorney fees to her pursuant to section 508(b) of

the Act because respondent's "flagrant conduct" necessitated the filing of two emergency motions

for injunctive relief.

¶ 114   It is improper for a trial court to award attorney fees for the dissolution proceedings in

general under section 508(b). *In re Marriage of Gattone*, 317 Ill. App. 3d 346, 360 (2000). Rather,

attorney fees may be imposed only under the circumstances set forth in section 508(b) of the Act.

The statute provides as follows:

"(b) In every proceeding for the enforcement of an order or judgment when the

court finds that the failure to comply with the order or judgment was without compelling

cause or justification, the court shall order the party against whom the proceeding is

brought to pay promptly the costs and reasonable attorney's fees of the prevailing party. If

non-compliance is with respect to a discovery order, the non-compliance is presumptively

without compelling cause or justification, and the presumption may only be rebutted by

clear and convincing evidence. If at any time a court finds that a hearing under this Act was precipitated or conducted for any improper purpose, the court shall allocate fees and costs of all parties for the hearing to the party or counsel found to have acted improperly. Improper purposes include, but are not limited to, harassment, unnecessary delay, or other acts needlessly increasing the cost of litigation." 750 ILCS 5/508(b) (West 2018).

Thus, the first part of section 508(b) mandates the assessment of costs and reasonable attorney fees where a failure to comply with a court order or judgment is found to be "without compelling cause or justification." 750 ILCS 5/508(b) (West 2018); *In re Marriage of McGuire*, 305 Ill. App. 3d 474, 481 (1999). The statute also mandates the assessment of costs and attorney fees when the court finds that a hearing was "precipitated or conducted for any improper purpose," including, but not limited to, "harassment, unnecessary delay, or other acts needlessly increasing the cost of litigation." 750 ILCS 5/508(b) (West 2018); *In re Marriage of Mouschovias*, 359 Ill. App. 3d 348, 357-58 (2005). An award of attorney fees under section 508(b) will not be overturned absent a clear abuse of discretion by the trial court. *In re Marriage of Michaelson*, 359 Ill. App. 3d 706, 715 (2005). Under this standard, we will reverse only if no reasonable person could agree with the trial court. *Keller*, 2020 IL App (2d) 180960, ¶ 11.

¶ 115   Initially, we agree with respondent that there was no basis to order him to contribute to petitioner's attorney fees under the first part of section 508(b) of the Act. As noted above, the first part of section 508(b) mandates the assessment of costs and reasonable attorney fees where a failure to comply with a court order or judgment is found to be "without compelling cause or justification." 750 ILCS 5/508(b) (West 2018); *McGuire*, 305 Ill. App. 3d at 481. In her section 508(b) petition, petitioner alleged that respondent had "fail[ed] to comply with a court order without compelling cause or justification" by unilaterally surrendering the three life insurance

policies that had been earmarked by the court in the dissolution judgment to pay attorney fees. In his response, respondent noted that he surrendered the insurance policies *before* the dissolution judgment had been entered. Thus, he asserted, he did not violate any court order. At the hearing on the petition, petitioner acknowledged that, at the time respondent surrendered the life insurance policies, he was not under a court order prohibiting him from doing so. Because the evidence of record does not support a finding that respondent violated a court order, the first part of section 508(b) does not provide a basis upon which the trial court could assess attorney fees. See *Gattone*, 317 Ill. App. 3d at 359-60 (holding that it was improper for the trial court to order the husband to contribute toward the wife's attorney fees under section 508(b) of the Act where the evidence did not support a finding that the husband violated a court order by using credit cards and withdrawing money from the marital estate).

¶ 116   Section 508(b) also mandates the assessment of costs and attorney fees when the court "finds that a hearing *** was precipitated or conducted for any improper purpose," including, but not limited to, "harassment, unnecessary delay, or other acts needlessly increasing the cost of litigation." 750 ILCS 5/508(b) (West 2018); *Mouschovias*, 359 Ill. App. 3d at 357-58. Again, we agree with respondent that this section of the statute does not provide a basis for the imposition of attorney fees. In her petition, petitioner alleged that respondent "needlessly, and intentionally, increase[d] [her] litigation costs" where (1) he filed a motion for reconsideration of the dissolution judgment and (2) the trial court granted two post-judgment emergency restraining orders against respondent. Petitioner further alleged that after respondent received notice of the second emergency order, he harassed her over the telephone. However, the trial court did not find that any hearing "was precipitated or conducted for any improper purpose" and there is nothing in the trial court's ruling to suggest that the trial court found that respondent engaged in an improper purpose

to support the imposition of an award of attorney fees under section 508(b) of the Act.

¶ 117 In this regard, we observe that the trial court found that respondent's motion for reconsideration was "not improper" and "by the very nature of the circumstances of this case probably it was necessary." Thus, the filing of the motion for reconsideration did not provide a basis to impose fees under section 508(b). In addition, the trial court made no finding that respondent had engaged in an "improper purpose" with respect to the proceedings leading to the emergency restraining orders against him. Indeed, the trial court does not reference the restraining orders in its ruling. Likewise, the court makes no mention of petitioner's allegation that respondent harassed her over the telephone. Moreover, the allegation of harassment as described by petitioner would in no way justify the imposition of almost $25,000 in attorney fees where it consisted of only one contact, during which respondent allegedly made insulting remarks about petitioner and her attorneys. Finally, to the extent that the trial court's ruling could be interpreted as awarding attorney fees for the dissolution proceedings in general, such an award is improper under section 508(b). *Gattone*, 317 Ill. App. 3d at 360. Because the trial court did not identify the conduct engaged in by respondent it found objectionable and required an award of fees, we conclude that the trial court abused its discretion in ordering respondent to contribute $24,746 toward petitioner's attorney fees.

¶ 118 We also point out that this court has held that an award of attorney fees under section 508(b) is " 'subject to a determination of reasonableness based on, *inter alia*, the time spent, the ability of the lawyers, and the complexity of the work.' " *Gattone*, 317 Ill. App. 3d at 360 (quoting *In re Marriage of Walters*, 238 Ill. App. 3d 1086, 1098 (1992)). We find nothing in the record before us regarding any of the above factors. It appears that the trial court did not determine the basis for the amount of fees petitioner requested or whether that amount was reasonable. Indeed,

the trial court denied respondent's request that petitioner identify the time spend on the work related to the fee award. For this reason as well, we also conclude that the trial court abused its discretion in ordering respondent to contribute $24,746 toward petitioner's attorney fees.

¶ 119   For all the foregoing reasons, we conclude that the trial court abused its discretion in ordering respondent to contribute $24,746 toward petitioner's attorney fees pursuant to section 508(b) of the Act. We therefore reverse that portion of the trial court's judgment.

¶ 120                                    III. CONCLUSION

¶ 121   For the reasons set forth above, we reverse that portion of the judgment of the circuit court of Kane County ordering respondent to pay $24,746 towards petitioner's attorney fees pursuant to section 508(b) of the Act. We also conclude that, with respect to the RSU shares, the trial court erred in calculating respondent's available income for his maintenance obligation. However, as the error was *de minimis*, it provides no basis upon which to modify the maintenance award. The judgment of the circuit court is affirmed in all other respects.

¶ 122   Affirmed in part and reversed in part.